Argued and submitted October 31, reversed and remanded November 28, 2007

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

TRAVIS ALAN RIDER,
aka Travis Rider,
aka Travis Allen Rider,
*Defendant-Appellant.*

Multnomah County Circuit Court
040633499; A128863

172 P3d 274

Ryan T. O'Connor, Deputy Public Defender, argued the cause for appellant. On the brief were Peter A. Ozanne, Executive Director, Peter Gartlan, Chief Defender, Legal Services Division, and Jamesa J. Drake, Deputy Public Defender, Office of Public Defense Services.

Susan G. Howe, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Haselton, Presiding Judge, and Armstrong and Rosenblum, Judges.

ROSENBLUM, J.

## ROSENBLUM, J.

Defendant appeals from a conviction for one count of first-degree burglary. ORS 164.225. Much of the evidence at defendant's trial was the product of a search that defendant consented to after the police had initiated a check to see if defendant had any outstanding warrants. Before trial, defendant unsuccessfully moved to suppress that evidence. He argues on appeal that he was unlawfully stopped during the warrant check and that his consent to the search and the evidence derived therefrom were products of exploitation of the unlawful stop. The state concedes that the police did not have reasonable suspicion of criminal activity when they initiated the warrant check, but it contends that the warrant check did not elevate the encounter between defendant and the police to a stop, so defendant's consent was not the product of exploitation of any police illegality. Even if defendant was stopped, the state argues further, his consent was not a product of the stop. We review the trial court's denial of the motion to suppress for errors of law, *State v. Woodall*, 181 Or App 213, 217, 45 P3d 484 (2002), and reverse.

The facts are not in dispute. In the course of investigating a series of burglaries, the Portland police learned that a man named Como was likely involved and that he was residing in room number four of a particular motel in Portland. They also learned that Como had an outstanding arrest warrant. Seven or eight police officers went to the motel to arrest Como. When they approached the motel, they recognized Como standing in the open doorway of room number four. When Como saw the police, he ran away. All of the officers except Detective Anderson chased him. Anderson was dressed in plain clothes but was wearing a bulletproof vest, and his badge and gun were visible, so he was readily identifiable as a police officer. He went to the open door where Como had been standing. Defendant and three other people were inside the room. Anderson told them that the police had a warrant for Como's arrest and that they would catch him. Anderson stayed outside, engaging the people in the room in "small talk." He asked them why Como had run away and open-ended questions such as, "What's going on?"

After three or four minutes, Anderson heard on his radio that the other officers had arrested Como. He then asked if he could enter the motel room. The woman who had rented the room, Tomlin, allowed him to come in. According to Anderson, the room was very small and everyone could hear everything that was said. Once inside, Anderson engaged in further small talk and then asked the occupants for their names, dates of birth, and addresses. He wrote the information in his notebook. After several minutes, one of the other officers, Davis, came into the room. Anderson handed her his notebook and asked her to perform a warrant check on the names listed. Davis left the room to use a radio in the parking lot.

Anderson then questioned each of the occupants of the motel room, questioning defendant last. Defendant was sitting on a couch with a backpack and schoolbooks; he appeared to be doing homework. Defendant was sweating profusely and was obviously nervous. Anderson asked him why he was there. Defendant responded that he had "a meth problem" and that he had come there after making a "meth connection." Anderson asked defendant for permission to search his backpack and a duffel bag that belonged to defendant. Defendant consented.

In the duffel bag, Anderson found a number of silver coins that appeared to be collectible. Anderson knew from experience that such coins were often stolen in burglaries. He asked defendant, "What's up with all this?" Defendant told him that he and Como shared the bag and that some of the items in it belonged to Como. Anderson continued to search the duffel bag and found more coins.

Anderson then obtained consent from Tomlin and the other woman in the room to search their belongings. When he finished that search, he asked Tomlin to step outside to talk in more detail. While they were outside the room, another detective informed Anderson that the other officers had searched Como and had found a large number of coins that were similar to those Anderson had found in the duffel bag. Anderson then asked defendant to step outside the room, where he told defendant that he was investigating Como in connection with some burglaries. Defendant denied

that he was a burglar, but he admitted that he had acted as a lookout for Como during a recent burglary.

Anderson arrested defendant and took him to the police station. There, defendant explained that he and Como had been walking around in the early morning hours the day before when Como suggested that they commit a burglary. He said that he and Como broke into a house and stole a large number of coins. Defendant agreed to show Anderson where the house was. Anderson showed the coins that he had retrieved from defendant to the homeowner, who identified them as his.

Defendant was indicted for first-degree burglary. Before trial, he moved to suppress the evidence on the ground that Anderson had stopped him without reasonable suspicion when he asked Davis to run the warrant check and that the subsequently discovered evidence was a product of that unlawful stop. The trial court denied the motion, concluding that defendant had not been stopped until Anderson asked him to step outside the motel room and that, at that point, Anderson had reasonable suspicion to believe that defendant was involved in a burglary. Following a bench trial, the court then found defendant guilty.

On appeal, defendant renews his argument that Anderson effected a stop without reasonable suspicion when he asked Davis to perform a warrant check. In response, the state acknowledges that Anderson did not develop reasonable suspicion to believe that defendant had committed a crime until after he searched the duffel bag, and it thus concedes that, if Anderson effected a stop before asking for defendant's consent to search the bag, the stop was unlawful. The state argues, however, that Anderson's request to Davis to perform a warrant check did not effect a stop.[1] The state

---

[1] The state also argues that, as a factual matter, defendant may not have known that he was the subject of a warrant check. At the suppression hearing, Anderson testified that, when Davis came into the room, "I had a list of names and the first thing I said, Hey, could you run these people for me on the radio, so check them for warrants." According to the state, the phrase "so check them for warrants" was not part of what Anderson actually said to Davis, but was merely an explanation to the court of what he meant by "run these people for me on the radio." The state takes the position that the statement "run these people for me on the radio" would not have alerted defendant to the fact that Anderson was instructing Davis to check for warrants. We disagree. In our view, any reasonable person would have understood what Anderson meant. Our view is supported by the fact

points out that Anderson never told defendant that he was not free to leave or that he was under suspicion of criminal activity, and did not take from defendant any formal piece of identification. The state argues further that, even if Anderson stopped defendant before asking for his consent to search the duffel bag, defendant's consent did not derive from the unlawful stop.

■ We first address whether Anderson stopped defendant before obtaining his consent for the search. Under Article I, section 9, of the Oregon Constitution, a stop occurs when (a) "a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) whenever an individual believes that (a), above, has occurred and such belief is objectively reasonable in the circumstances." *State v. Holmes*, 311 Or 400, 409-10, 813 P2d 28 (1991). Both this court and the Supreme Court have repeatedly held that, when an officer retains a person's identification for investigatory purposes during questioning, the person is restrained from leaving. *See, e.g., State v. Hall*, 339 Or 7, 19, 115 P3d 908 (2005) ("When [the officer] took defendant's identification card and radioed the police dispatch for a warrant check, * * * the consensual nature of that encounter dissipated, and the encounter evolved from a 'mere conversation' encounter into a restraint upon defendant's liberty of movement."); *State v. Harper*, 197 Or App 221, 235, 105 P3d 883 (2005) ("[A]n officer's retention of a person's identification for investigatory purposes during · questioning restrains the person from leaving and, therefore, constitutes a stop.").

In this case, as the state points out, Anderson did not ask for, let alone retain, any physical form of identification. That fact, however, is not dispositive. The Supreme Court explained in *Hall* that retention of identification is not necessary to effect a stop if the person is aware that the officer is investigating whether the person is the subject of any outstanding arrest warrants. 339 Or at 19. In that case, a police officer had taken the defendant's identification card, called

---

that, at the suppression hearing, it was implicit in the arguments of both the prosecutor and defense counsel that Anderson's statement to Davis conveyed that he was requesting a warrant check. Nothing that the trial court said indicates that it took a different view of the facts.

for a warrant check on his radio, and then immediately returned the card. While the officer was waiting for the results of the warrant check, he asked for the defendant's consent to search him. The court found it "difficult to posit that a reasonable person would think that he or she was free to leave at a time when that person is the investigatory subject of a pending warrant check." *Id.*

■       The state does not dispute the fact that defendant heard Anderson ask Davis to perform a warrant check. In light of *Hall*, we conclude that, when Anderson ordered the warrant check, the encounter evolved into a restraint on defendant's liberty. In other words, the encounter evolved into a stop. Given the state's concession—with which we agree—that Anderson lacked reasonable suspicion to stop defendant at that point, the stop was unlawful.

■       We turn to the state's argument that defendant's consent did not derive from the unlawful stop. To show that evidence is a product of exploitation, a defendant must establish "the existence of a minimal factual nexus—that is, at minimum, the existence of a 'but for' relationship—between the evidence sought to be suppressed and prior unlawful police conduct * * *." *Id.* at 25. Relying on our opinion in *State v. Atkin*, 190 Or App 387, 78 P3d 1259 (2003), *rev den*, 339 Or 230 (2005), the state argues that defendant did not establish a "but for" relationship between the stop and Anderson's request for consent to search.

In *Atkin*, a police officer unlawfully stopped the defendant. During the stop, the defendant consented to allow the officer to search her purse, where he found methamphetamine. *Id.* at 389. The defendant argued that evidence of the methamphetamine was the product of exploitation of the unlawful stop. The trial court denied her motion to suppress, and, on appeal, we affirmed. We held that the defendant could not establish the necessary connection between the illegal stop and the request for consent to search her purse. *Id.* at 392 ("In fact, defendant cannot even establish a 'but-for' relationship between the illegal stop and the request."). We noted that, although it was true that the officer's observation of the purse, and therefore his request to search it, occurred *during* the illegal stop, there was no evidence that it occurred as a result of it. *Id.* According to the state, the same is true here.

The state's reliance on *Atkin* is misplaced. Our holding was based on a legal assumption that the Supreme Court rejected in *Hall*. In *Atkin*, we stated that "[e]xploitation occurs when police use information or knowledge gained as a result of their illegal activity in order to obtain consent." 190 Or App at 392. In *Hall*, the Supreme Court stated that its previous decisions did not

> "stand for the proposition that suppression is required only if the unlawful police conduct had allowed the discovery of inculpatory evidence that led to a request for consent. Instead, this court's case law * * * makes clear that Article I, section 9, also requires the consideration of the effect of the unlawful police conduct upon the defendant's decision to consent * * *."

339 Or at 32.

■    It is clear from our opinion in *Atkin* that we considered only whether the unlawful stop had yielded information that the police then used to obtain the defendant's consent. In light of *Hall*, our analysis was unduly limited, so *Atkin* is not good law.[2] We reject the state's argument that defendant failed to establish a "but for" relationship between the unlawful stop and his consent to the search.

The state does not advance any argument that some other fact or circumstance severed the causal connection between the stop and defendant's consent. *See Hall*, 339 Or at 25 (once the defendant establishes a "but for" relationship, the state may show that the link is too tenuous, that the parties inevitably would have discovered the evidence through lawful means, or that the police obtained the evidence independently of the violation). Accordingly, we conclude that the evidence that defendant seeks to suppress is the unattenuated product of exploitation of the unlawful stop. It follows that the trial court erred in denying defendant's motion to suppress.[3]

Reversed and remanded.

---

[2] The state points out that the Supreme Court denied review of our decision in *Atkin* after it issued its opinion in *Hall*. According to the state, *Atkin* therefore remains good law. We disagree. Because the Supreme Court denied review without issuing an opinion, we do not know its reasons for the denial. It is clear, however, that our analysis in *Atkin* conflicts with *Hall*.

[3] We note that the Supreme Court announced its decision in *Hall* several months after the trial court ruled on defendant's motion to suppress, so the trial court did not have the benefit of *Hall* in making its ruling.