Submitted June 11, reversed and remanded December 31, 2008, petition for review
denied June 17, 2009 (346 Or 361)

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## MARTIN ASTORGA,
*Defendant-Appellant.*

Washington County Circuit Court
C052987CR; A131639

200 P3d 170

David E. Groom filed the brief for appellant.

Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Christina M. Hutchins, Senior Assistant Attorney General, filed the brief for respondent.

Before Landau, Presiding Judge, and Schuman, Judge, and Ortega, Judge.

SCHUMAN, J.

## SCHUMAN, J.

Defendant appeals a judgment of conviction for possession of methamphetamine, ORS 475.894, arguing that the evidence against him should have been suppressed because it derived from an encounter in which the police unlawfully stopped him. This case requires us once again to confront the recurring question of when an encounter between a police officer and citizen amounts to the seizure of a person and, for that reason, must meet the standards imposed by Article I, section 9, of the Oregon Constitution.[1] Defendant maintains that he was seized when a police officer, in his presence, contacted authorities in order to determine whether defendant was the subject of outstanding warrants—an event that occurred, as the state concedes, before the officer had reasonable suspicion that defendant was engaging in or had engaged in criminal activity. The state, on the other hand, maintains that the inquiry did not convert an otherwise constitutionally insignificant conversation into a stop; the stop occurred only later, after the officer reasonably suspected that defendant had violated a condition of his probation. The state also contends that, regardless of when the stop occurred, the evidence was admissible because it would have inevitably been discovered through entirely lawful means. We agree with defendant, and we therefore reverse and remand.

■    "Given the diversity of potential police-citizen encounters * * *, the determination of whether a person has been seized under Article I, section 9, and, if so, at what point in the encounter, will require a fact-specific inquiry into the totality of the circumstances of the particular case." *State v. Holmes*, 311 Or 400, 408, 813 P2d 28 (1991). Here, the facts are undisputed on appeal. Hillsboro Police Officer Vertner, while on patrol, observed defendant, on his bicycle, approach the driver's side of a car parked in a vacant parking lot. Believing that this behavior was consistent with "people doing a drug transaction"—a belief that the state concedes does not amount to a reasonable suspicion of criminal activity

---

[1] Article I, section 9, of the Oregon Constitution provides, in part:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]"

because it was not based on specific and articulable facts, ORS 131.605(5); *State v. Belt*, 325 Or 6, 12, 932 P2d 1177 (1997)—Vertner parked his police car in the lot and walked over to the two men. Vertner observed a "slight odor of alcoholic beverage" on defendant. He told both men, "I like to get to know people in my area" and informed them that they were "free to go." He then asked each man for his name and date of birth, which each provided, after which he asked them what they were doing in the area. The driver responded that he had just finished work; defendant stated that he was there to speak to the driver about a job. At that point, a second officer, Buhl, arrived on the scene in his police car. Vertner then asked each man for consent to search his person. The driver consented; defendant refused.

Vertner "ran * * * [defendant's] information through dispatch," standing three to five feet from defendant and speaking in a normal voice. As a result of the check, Vertner learned that defendant was on probation, the conditions of which prohibited him from consuming alcohol. While on the line with dispatch, Vertner asked defendant if he had consumed any alcohol, and defendant responded that he had consumed "two or three beers" that day. After answering Vertner's question, defendant asked if he was free to go. Vertner said "no," believing that he now had probable cause to arrest defendant for violating his probation.

Buhl handcuffed defendant and Vertner contacted defendant's probation officer, who placed a detainer on defendant. Vertner then conducted a patdown search of defendant's person, seized a glass pipe, and arrested defendant on the basis of the probation detainer. A search of defendant's person pursuant to that arrest yielded the methamphetamine at issue in this case.

In his pretrial motion to suppress, defendant argued that a stop occurred when Vertner radioed dispatch in defendant's presence; that the stop was unlawful because, at that point, Vertner did not have reasonable suspicion that defendant was involved in criminal activity; and that the subsequently discovered evidence was a product of that unlawful stop and therefore should have been suppressed. The trial court agreed with defendant that a stop occurred when the

officer radioed dispatch, but denied defendant's motion on the ground that, once Vertner received the information regarding defendant's probationary status, he developed a lawful basis to arrest defendant. That arrest would necessarily have entailed a search of defendant's person; thus, the court concluded, the methamphetamine on defendant's person would inevitably have been discovered through lawful procedures. Defendant was thereafter convicted on stipulated facts. On appeal, he renews the argument that he presented before the trial court. As we will explain, we conclude that the officer's encounter with defendant became a stop when the officer radioed dispatch; that, at that time, the officer did not have reasonable suspicion of criminal activity; that the discovery of methamphetamine on defendant's person derived directly from the unlawful stop; and that the causal link between that stop and the discovery was not broken by inevitable discovery.

■ ■ We begin with the question of when Vertner's encounter with defendant became a "stop" for purposes of Article I, section 9. In *Holmes*, 311 Or at 409-10, the Supreme Court held that a person is "seized" for purposes of Article I, section 9,

> "(a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) whenever an individual believes that (a), above, has occurred and such belief is objectively reasonable in the circumstances."

One's liberty or freedom of movement has not been interfered with when an officer

> "engages in conduct significantly beyond that accepted in ordinary social intercourse. The pivotal factor is whether the officer, even if making inquiries a private citizen would not, has otherwise conducted himself in a manner that would be perceived as a nonoffensive contact if it had occurred between two ordinary citizens."

*Id.* at 410. In the present case, defendant argues that, under the definition in *Holmes*, a stop of the second type ("(b)," above) occurred when the officer radioed defendant's information to dispatch for a records check.

We agree with defendant. The evidence demonstrates that, despite Vertner's assurance early in the encounter that defendant was free to leave, defendant was not convinced. The trial court found that defendant asked Vertner if he was free to go while Vertner was conducting the warrant check. That, along with defendant's awareness that he was in violation of a condition of his probation, constitutes strong circumstantial evidence that defendant believed that he was *not* free to go. The record contains no evidence to suggest otherwise. And although the trial court did not make an express finding of fact regarding defendant's state of mind, the record shows that the court applied the correct definition of "stop" and reached the conclusion that a stop occurred when Vertner radioed in defendant's information. The court could not have reached that legal conclusion unless it had implicitly resolved any ambiguity regarding defendant's subjective belief and found that defendant did not believe that he was free to leave. *See Ball v. Gladden,* 250 Or 485, 488, 443 P2d 621 (1968) (appellate court "will presume that the facts were decided in a manner consistent with the [trial court's] ultimate conclusion").

Further, that belief was objectively reasonable. The Supreme Court held in *State v. Hall,* 339 Or 7, 19, 115 P3d 908 (2005), that, when an officer took the defendant's identification card, radioed dispatch to conduct a warrant check, and then promptly returned the card, a stop occurred, because "a reasonable person would [not] think that he or she was free to leave at a time when that person is the investigatory subject of a pending warrant check." The court further observed that the officer in that case "did nothing to dispel [that] objectively reasonable belief." *Id.* Applying that principle, this court held in *State v. Rider,* 216 Or App 308, 310-11, 312-13 n 1, 314, 172 P3d 274 (2007), *rev allowed,* 345 Or 94 (2008), that, when an officer ordered a warrant check after requesting and recording the defendant's name, date of birth, and address, that encounter became a restraint on the defendant's liberty—a "stop"—requiring reasonable suspicion, even though the officer did not ask for or retain the defendant's identification documents, because a reasonable person would have understood the officer's request to "run these people for me on the radio" to mean that the officer was checking

the defendant for warrants and would not allow the defendant to depart. Here, defendant heard Vertner calling dispatch and making inquiries about him. At the time, he was in the presence of two police officers, at least one of whom was wearing a uniform, complete with badge, gun, "baton," handcuffs, and "OC spray." He had been asked his name and birth date, had been asked to account for his presence in a public place, and had been asked to allow himself to be searched—treatment that is "significantly beyond that accepted in ordinary social intercourse," even allowing for the fact that police can make inquiries that ordinary citizens cannot. *Holmes*, 311 Or at 410. A reasonable person in defendant's position "could have believed," *State v. Toevs*, 327 Or 525, 536, 964 P2d 1007 (1998); *accord State v. Ashbaugh*, 225 Or App 25, 200 P3d 149 (2008) that his or her liberty of movement had been significantly restricted, despite the officer's preliminary statement to the contrary—a statement accompanied by the transparently disingenuous statement that the officer asked him his name and birth date because he wanted to "get to know" him.

█  We also conclude that the stop was unlawful. When Vertner radioed dispatch, he had not yet been informed that defendant was on probation; he therefore lacked reasonable suspicion that defendant had violated his probation or had been involved in some other criminal activity. *See State v. Ehret*, 184 Or App 1, 7, 55 P3d 512 (2002) (reasonable suspicion requires that an officer subjectively believe that a person has committed a crime and that the belief be objectively reasonable in light of the totality of the circumstances).

██  "[T]he critical inquiry," then, "is whether the state obtained the evidence sought to be suppressed as a result of a violation of the defendant's rights under Article I, section 9," in which case suppression is warranted. *Hall*, 339 Or at 24. The burden is initially on the defendant; the defendant must establish the existence of a minimal factual nexus—that is, at minimum, the existence of a "but for" relationship—between the unlawful police conduct and the evidence sought to be suppressed. *Id.* at 25. The state may then establish that the disputed evidence is nonetheless admissible by proving that it did not derive from the prior illegality by showing either (1) that the evidence would have been discovered "independent[ly] of" that illegality (*i.e.*, it inevitably would

have been discovered through the exercise of lawful procedures, or it was obtained not only as a result of the illegality, but also as the result of a chain of events that did not include any illegality) or (2) that the connection between the unlawful stop and the discovery of evidence is so tenuous that the unlawful police conduct cannot be viewed properly as the source of that evidence. *State v. Tyler*, 218 Or App 105, 110, 178 P3d 282 (2008) (citing *Hall*, 339 Or at 34-35).

■■ Defendant has met his burden to show the requisite "but for" connection: but for the unlawful stop, Vertner would not have been in a position to arrest and subsequently search defendant. The question of whether the evidence should have been suppressed, then, turns on whether the state has established that the discovery of evidence was "independent of, or only tenuously related to, the unlawful police conduct." *Hall*, 339 Or at 34-35. To that end, the state contends that the evidence was admissible because it would inevitably have been discovered by lawful means; that is, "absent the illegality, by proper and predictable police investigatory procedures." *State v. Johnson*, 335 Or 511, 514-15 n 2, 73 P3d 282 (2003) (internal quotation marks omitted). Specifically, it argues that, had defendant left the parking lot before Vertner radioed dispatch, Vertner still would have run the warrant check and, upon discovering the information about defendant's probation, "would have gone after defendant" and "arrested him for the probation-violation detainer." Following that arrest, the state asserts, defendant "would have been searched and the methamphetamine would have inevitably been discovered then or at the jail."

The state's argument relies on the following testimony adduced on cross-examination of Vertner:

"[DEFENSE COUNSEL]: So if [defendant] would have just left and you found out he had a warrant, you would have gone after him, correct?

"[OFFICER VERTNER]: Correct."[2]

---

[2] Presumably, defense counsel meant to inquire as to whether Vertner would have gone after defendant after discovering that defendant was on probation and thereby prohibited from consuming alcohol; the record does not disclose that defendant "had a warrant."

This exchange, however, does not establish that Vertner would, in fact, have run a warrant check if defendant had left. Even if Vertner had so testified, there is no evidence that he would have caught defendant or that defendant would have retained the methamphetamine so as to render its discovery inevitable. Nor is there any evidence in the record about just what "proper and predictable police investigatory procedures" would have occurred. In short, the state's theory is built entirely on speculation; the facts do not support the inference that the methamphetamine would inevitably have been discovered.

In sum, we conclude that, when the police officer contacted dispatch to inquire about defendant, and defendant was aware of that contact, a stop occurred. At that time, the police officer did not have a reasonable suspicion, based on specific and articulable facts, that defendant was engaged in or had engaged in criminal activity; the stop was therefore unlawful. That unlawful stop led directly to the discovery of the evidence at issue. Defendant's motion to suppress should have been granted.

Reversed and remanded.