Argued and submitted June 23, judgment of conviction vacated; remanded for
further proceedings December 9, 2009

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## LELAND JAY HEMENWAY,
*Defendant-Appellant.*

Tillamook County Circuit Court
071107; A136981

222 P3d 1103

Susan F. Drake, Senior Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Appellate Division, Office of Public Defense Services.

Susan G. Howe, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Erika L. Hadlock, Acting Solicitor General.

Before Edmonds, Presiding Judge, and Sercombe, Judge, and Carson, Senior Judge.

SERCOMBE, J.

## SERCOMBE, J.

Defendant appeals a conviction for possession of methamphetamine. ORS 475.894. He assigns error to the trial court's denial of his motion to suppress evidence of incriminating statements and of drugs and drug paraphernalia seized during searches of his person and residence. Defendant argues that he was unlawfully stopped by the police in violation of his rights under Article I, section 9, of the Oregon Constitution.[1] He further contends that his inculpatory statements and consent to the searches resulted from that unlawful police conduct. For the reasons stated below, we vacate defendant's conviction and remand for further proceedings.

We state the facts consistently with the trial court's explicit and implicit findings. *State v. Ehly*, 317 Or 66, 74-75, 854 P2d 421 (1993); *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968). In April 2007, deputies Orella and Russell responded to a call from Taylor, defendant's girlfriend, regarding the Taylor residence's electric power and the whereabouts of Taylor's son. The deputies, in separate cars, arrived at Taylor's residence just before midnight. Both deputies parked in the driveway behind defendant's truck, blocking the truck's exit route. The deputies were in uniform, carrying guns, and driving marked sheriff's vehicles. Defendant and Taylor were both outside the house when the deputies arrived. Deputy Orella approached Taylor and instructed defendant to go talk to Deputy Russell. Orella then informed Russell that he had observed a rifle in defendant's truck.

Defendant met Russell near the back of the truck and voluntarily explained that he was in the process of moving out of the house and many of his belongings were in the truck, including the rifle and a handgun. Russell asked defendant if he was a felon; defendant responded that he was not. In order to verify defendant's assertion that he was not a felon, Russell asked for defendant's name and date of birth. Defendant provided the information to Russell. Defendant asked Russell's permission to have a cigarette. Russell said

---

[1] Article I, section 9, provides, in part, that "[n]o law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]"

that he could, but that he wanted to search defendant to "ease his mind." Defendant agreed to that search. Russell found a breath mint tin in one of defendant's pockets. The trial court found that Russell first asked if he could open the tin, and, after defendant agreed, Russell discovered a methamphetamine pipe and a baggie that Russell suspected contained methamphetamine residue. Russell placed defendant under arrest and advised him of his *Miranda* rights.

Russell then asked defendant if he had more drugs in the house. Defendant admitted that there might be and consented to Russell retrieving the drug-related items from the house. Defendant accompanied Russell into the house and pointed out where the methamphetamine paraphernalia was, which Russell then located and seized.

Before trial, defendant moved to suppress all evidence obtained from the warrantless search of his person and residence and his inculpatory statements made to the deputies. Defendant argued that the deputies' conduct before his grants of consent and statements constituted an unlawful stop under Article I, section 9, of the Oregon Constitution and that Russell exploited the unlawful stop when he obtained defendant's consents and statements. The trial court determined that defendant was not "seized" by Russell and that defendant's consents were voluntary. Defendant entered a conditional plea of guilty, reserving the right to appeal the trial court's denial of his motion to suppress. This appeal followed.

On appeal, defendant assigns error to the denial of his motion to suppress, again arguing that the evidence obtained against him was the result of an unlawful stop. Defendant further argues that the acts of blocking his truck, obtaining his identification in order to run a criminal check, and asking to search defendant both independently and collectively constituted a stop. The state contends that the actions did not constitute a stop and that defendant's grants of consent were voluntary. Alternatively, the state argues that, even if the deputy's actions did constitute a stop, the seizure was temporary and reasonable under the totality of the circumstances. Under ORS 133.693(4), where, as here, a "motion to suppress challenges evidence seized as the result

of a warrantless search, the burden of proving by a preponderance of the evidence the validity of the search is on the prosecution."

We conclude that defendant reasonably could have believed that he was stopped under Article I, section 9, when the movement of his truck was physically constrained, he was directed to move to a location to speak with a deputy, his identification was obtained, and he was questioned by the deputy. If defendant actually held that subjective belief, the stop was unlawful under the state constitution because it occurred without any reasonable suspicion of criminal activity. Defendant's grants of consent and admissions resulted from the unlawful stop, which, in turn, yielded the evidence he sought to have suppressed. Under *State v. Hall*, 339 Or 7, 25, 115 P3d 908 (2005), that evidence could have been suppressed because its discovery was not otherwise inevitable or sufficiently attenuated from the unlawful police conduct.[2]

We use a two-step analysis to determine the legality of a stop under Article I, section 9. We first determine whether a stop occurred; and, if so, we then assess whether the government agent had reasonable suspicion to justify the stop. *State v. Jacobus*, 318 Or 234, 239, 864 P2d 861 (1993). If a stop is unlawful, we must then determine whether there was a causal connection between the unlawful stop and the defendant's consent to determine whether the evidence must be suppressed. *See, e.g.*, *Hall*, 339 Or at 25.

The first question, then, is whether defendant was stopped during his encounter with Russell. A stop is a temporary restraint of a person's liberty. *State v. Holmes*, 311 Or 400, 406-07, 813 P2d 28 (1991). Under Article I, section 9, a stop occurs when "a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement." *Id.* at 409. Alternatively, a stop can occur "whenever an individual believes that [a restraint on liberty] has occurred and such belief is objectively reasonable in the circumstances." *Id.* at 409-10 (footnote omitted). A stop of that

---

[2] We resolve this case on the basis of defendant's claim that Russell's combined acts constitute an unlawful stop. Given that resolution, we do not need to determine if each of those acts evidenced a stop.

second type occurs "whenever a person *subjectively* believes that a law enforcement officer significantly has restricted or interfered with that person's liberty or freedom of movement *and* such a belief is *objectively reasonable* under the circumstances." *State v. Toevs*, 327 Or 525, 535, 964 P2d 1007 (1998) (emphasis in original). A belief is "objectively reasonable" if a "reasonable person in [the] defendant's position could have believed that the officers significantly had restricted his [or her] liberty or freedom of movement." *Id.* at 536. To determine whether a stop occurred, a court examines the totality of the circumstances in the particular case. *Holmes*, 311 Or at 408; *see generally State v. Anderson*, 231 Or App 198, 203, 217 P3d 1133 (2009); *State v. Ashbaugh*, 225 Or App 16, 25, 200 P3d 149 (2008), *rev allowed*, 346 Or 257 (2009).

Defendant testified that he consented to the initial search because he "didn't feel [he] really had a choice" and that he did not believe he was free to leave the scene. To determine whether such a belief would be objectively reasonable, we must look at the totality of the circumstances. In this case, there were five actions by the deputies that, when combined, may have objectively led to those beliefs: (1) the deputies parked their cars behind defendant's truck, blocking his exit; (2) Orella told defendant to talk to Russell; (3) Russell asked defendant if he was a felon; (4) Russell then asked for defendant's identification; and (5) Russell asked if he could search defendant's person.

First, both deputies parked their police cars in the driveway behind defendant's truck, blocking his truck's exit. We previously have held that a stop occurs when an officer's vehicle blocks a defendant's vehicle in a manner that would prevent it from being driven away. *State v. Mesenbrink*, 106 Or App 306, 309, 807 P2d 319, *rev den*, 312 Or 235 (1991). In that case, the defendant was suspected of driving under the influence, and it was the officer's intention to prevent him from leaving. *Id.* at 308. Here, however, there is no indication that the deputies had any intent other than to park their cars. Nonetheless, the result is similar: they blocked defendant's exit so that he would have had to ask them to move their cars for him to leave the premises in his truck. Although this action alone might not constitute a stop, it is relevant in

assessing the reasonableness of defendant's state of mind under the totality of the circumstances.

Second, Orella told defendant to talk to Russell, and defendant altered his course of travel to do so. The Oregon Supreme Court determined that for an officer's conduct to be construed as a stop, the conduct must be "significantly beyond that accepted in ordinary social intercourse." *Holmes*, 311 Or at 410. In *Hall*, the officer summoned the defendant with two fingers. 339 Or at 10. That action was not significantly beyond ordinary social intercourse because the officer did not show the requisite level of authority, and the request did not intrude on the defendant's liberty. *Id.* at 19. On the other hand, an officer may intrude on a defendant's liberty if the defendant is forced to "alter his course of conduct or is summoned away from a task." *State v. Crandall*, 197 Or App 591, 595, 108 P3d 16 (2005), *rev'd on other grounds*, 340 Or 645, 136 P3d 30 (2006). In *Crandall*, we held that the defendant was stopped when he was forced to alter his course of travel and walk approximately 100 feet to the beckoning police officer. *Id.* at 595-96. Here, defendant was told to talk to Russell and, to do so, he needed to alter his course of travel. That alteration, however, took defendant only a few feet from his intended destination. Again, although that action may not constitute a stop, the intrusion on defendant's liberty is a factor in the *Holmes* analysis.

Third, Russell asked defendant if he was a felon, then asked for defendant's name and date of birth to (1) confirm the accuracy of defendant's denial, and (2) investigate whether defendant was a felon in possession of a firearm pursuant to ORS 166.270. We have previously determined that a reasonable person could conclude that he or she was being detained when a law enforcement officer demanded identification in the context of a communicated intent to investigate a crime. *State v. Highley*, 219 Or App 100, 110, 180 P3d 1230 (2008); *State v. Rider*, 216 Or App 308, 313-14, 172 P3d 274 (2007), *rev dismissed*, 345 Or 595 (2008). In *Rider*, the defendant was in a hotel room with a man who, in addition to having an outstanding warrant for his arrest, ran from the police when they arrived. The defendant, along with three others, stayed in the room. The officer asked the defendant and the

others for their names and dates of birth for a warrant check, without requesting any form of official identification. 216 Or App at 310-11. We held that that was a stop, stating that "retention of identification is not necessary to effect a stop if the person is aware that the officer is investigating whether the person is the subject of any outstanding arrest warrants." *Id.* at 313 (citing *Hall*, 339 Or at 19).

In *Highley*, we analyzed a number of cases in which an officer had requested a defendant's identification and had run a records check. We concluded that

> "a *retention* of a suspect's identification, or the length of retention of a suspect's identification, is not the touchstone of whether a stop has occurred. Rather, the question is whether, under the totality of the circumstances, the suspect reasonably believes that he or she is under investigation and is not free to leave. An officer's actions in checking identification, temporarily taking identification, writing down identifying information, and calling in information to a dispatcher all are logically relevant to that inquiry."

219 Or App at 109 (emphasis in original). The facts in *Highley* are very similar to this situation. There, the officer first asked the defendant if he was on probation. When the defendant said that he was not, the officer asked for identification to verify that answer. The officer then wrote down the information from the defendant's license and went to conduct the check. *Id.* at 103. This court held that, because the officer had inquired about the defendant's probationary status then promptly asked for identification, the defendant would reasonably have understood that he was the subject of an investigation, and it was therefore a stop. *Id.* at 108, 110; *see also State v. Zamora-Martinez*, 229 Or App 397, 403-04, 211 P3d 349 (2009) (request for additional identification sufficient to convert encounter into a stop).

Here, Russell first asked if defendant was a felon; when defendant said that he was not, Russell asked for defendant's name and date of birth for verification. The facts are inconclusive as to whether Russell actually performed the check, but because Russell first inquired about defendant's status as a felon, then promptly asked for identifying

information, we conclude that defendant could reasonably have understood that he was the subject of an investigation.

Given that defendant was physically blocked from exiting in his truck by the deputies' cars, that he was told to speak to Russell and had to alter his course to do so, and that Russell asked if defendant was a felon and subsequently asked for his verifying information, it would have been objectively reasonable for defendant to have believed that his liberty was constrained under the circumstances. The deputies' actions could be construed as interfering with or otherwise depriving defendant of his liberty or freedom of movement. If defendant felt that he was being detained, then the deputies' actions constituted a stop under the *Holmes* test.[3]

As noted, defendant testified that he did not feel free to leave the scene. But the trial court made no finding on defendant's subjective belief. Accordingly, we must remand to the trial court for such a finding, unless the state has demonstrated that defendant's belief is irrelevant because either reasonable suspicion of criminal activities justified any stop or because defendant's grants of consent to search were independent of any prior illegalities. *Ashbaugh*, 225 Or App at 28; *Zamora-Martinez*, 229 Or App at 404 (remanding for trial court finding on the defendant's subjective belief under *Holmes* test).[4]

██ The next question, then, is whether the deputies had reasonable suspicion to stop defendant. "Reasonable suspicion requires a subjective belief by the police officer that the person has committed a crime or is about to commit one, and that belief must be objectively reasonable under the totality of the circumstances." *State v. Hitchcock/Winters*, 224 Or App 77, 86, 197 P3d 33 (2008) (citing ORS 131.605(5) and *State v. Ehret*, 184 Or App 1, 7, 55 P3d 512 (2002)). The state makes no claim that defendant had committed a crime or was

---

[3] The final action by Russell that was identified by defendant as contributing to the events constituting a stop was his request to search defendant's person. However, because we already have determined that the combined actions by the deputies would have been sufficient to constitute a stop when the request occurred, it is not necessary to determine the legal effect of that request.

[4] *But cf. State v. Dudley*, 232 Or App 436, 437, 222 P3d 709 (2009) (remand unnecessary where the state conceded that the case did not need to be remanded for findings on the defendant's subjective beliefs under *Ashbaugh*).

about to undertake criminal activity. Thus, the deputies' actions constituted a stop without reasonable suspicion of criminal activity, and the stop was unlawful under Article I, section 9, if defendant subjectively believed he was being detained.

 Because we conclude that the stop was potentially unlawful, we consider the effect of any illegality on the admissibility of the evidence obtained. Evidence obtained from a warrantless search is subject to suppression under the Oregon exclusionary rule if the defendant's consent to the search is the product of an exploitation of the preceding unlawful stop. *Hitchcock / Winters*, 224 Or App at 87 (citing *Hall*, 339 Or at 21). For an exploitation to exist, a defendant must first establish the existence of a causal connection, *i.e.*, a "but for" relation, between the evidence sought to be suppressed and the unlawful police conduct. *Hall,* 339 Or at 25. If a defendant successfully does so, the state then has the burden to demonstrate that the evidence was not obtained by an exploitation of the unlawful conduct, but rather, that "the defendant's consent was independent of, or only tenuously related to, the unlawful police conduct." *Id.* at 34-35. Factors that we consider in assessing the dependence of a defendant's consent include temporal proximity between the unlawful police conduct and the consent, the existence of any intervening circumstances, and the existence of any mitigating circumstances—such as a police officer informing defendant of the right to refuse consent. *Id.* at 35.

 Defendant consented to two separate searches: one of his person and another of his residence. Defendant has shown the requisite causal connection between the unlawful stop and both grants of consent and his inculpatory statements: but for the unlawful stop, Russell would not have been able to request defendant's consent for either search or request information from defendant. Further, defendant's first consent occurred contemporaneously with the stop, with no intervening or mitigating factors. It was therefore dependent on the unlawful stop and was not attenuated. His second consent, however, occurred after Russell gave defendant *Miranda* warnings.

We have determined that the giving of *Miranda* warnings is a consideration in the attenuation analysis. In *State v. Ayles*, 220 Or App 606, 616, 188 P3d 378, *rev allowed*, 345 Or 460 (2008), we stated:

> "*Miranda* warnings following an unlawful seizure or entry does not *per se* attenuate the taint of the prior illegal police conduct. Rather, the asserted 'attenuating' effect of *Miranda* warnings must be assessed in the totality of the circumstances, including whether the defendant subsequently, and without police prompting, unilaterally volunteered information or consented to search."

In *Ayles*, the defendant was unlawfully stopped, consented to a search, and was handcuffed and given *Miranda* warnings after drugs were found on his person. The arresting officer then further questioned the defendant as the result of the inculpatory drug evidence obtained. In response, the defendant admitted to having drugs in his backpack. The defendant did not spontaneously offer the incriminating statements; rather, the statements were prompted by the officer's questions. *Id.* We determined that, because each phase of the encounter flowed in sequence, the giving of *Miranda* warnings failed to mitigate the significant effects of the unlawful police conduct on the defendant's decision to respond to the officer's questions. *Id.*

We reached the same conclusion in *State v. La France*, 219 Or App 548, 557, 184 P3d 1169 (2008), and noted:

> "A reasonable person in defendant's position would not interpret those warnings—the right to remain silent and not to make incriminating statements, the right to have advice of counsel, and the right to have court-appointed counsel at public expense—to mean that the person was not required to consent to a request to be searched. Rather, the warnings, generally given to persons in custody, could perpetuate the person's perception that his or her liberty continued to be restrained as the officer pursued a criminal investigation by seeking consent to a search."

In this case, defendant's second grant of consent led to further incriminating evidence from the house search after he was given *Miranda* warnings. Similar to *Ayles*, defendant

did not offer the information on the existence or location of drug paraphernalia voluntarily; he was prompted by repeated questions from Russell. Therefore, Russell's giving of *Miranda* warnings to defendant was insufficient to break the causal connection and all the evidence sought to be suppressed flowed from the preceding potentially unlawful stop. *See generally State v. Robbins*, 232 Or App 236, 221 P3d 801 (2009) (discussing effect of *Miranda* warnings on causal connection between prior illegality and discovery of evidence). The state has not shown that the evidence is so tenuously related to the prior illegality as to render it admissible. Therefore, the evidence may have been obtained as a result of an unconstitutional deprivation of defendant's liberty, and the trial court may have erred in denying defendant's motion to suppress evidence.

On remand, then, if the court finds that defendant did not believe that he was being detained and therefore was able to leave, the court should reinstate defendant's conviction. However, if the court determines that defendant did subjectively believe that he was unable to leave, the evidence must be suppressed.

Judgment of conviction vacated; remanded for further proceedings.