Argued and submitted November 24, 2009, reversed and remanded for entry of judgment reflecting a single conviction of possession of a forged instrument on Counts 1 through 3 and for resentencing; otherwise affirmed September 29, 2010

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## MERCADO SALVADOR,
*Defendant-Appellant.*

Deschutes County Circuit Court
07FE1459MA; A138522

241 P3d 324

Anne Fujita Munsey, Senior Deputy Public Defender, argued the cause for appellant. With her on the briefs was Peter Gartlan, Chief Defender, Appellate Division, Office of Public Defense Services.

Michael R. Washington, Senior Assistant Attorney General, argued the cause for respondent. With him on the brief were John R. Kroger, Attorney General, and Jerome Lidz, Solicitor General.

Before Landau, Presiding Judge, and Schuman, Judge, and Ortega, Judge.

LANDAU, P. J.

## LANDAU, P. J.

In this criminal case, defendant was convicted after a conditional guilty plea of four counts of possession of a forged instrument, ORS 165.022, and one count of counterfeiting, ORS 647.145(1)(a)(B). On appeal, he assigns error to the trial court's denial of his motion to suppress and to its failure to merge three of the forgery convictions into a single conviction. We conclude that the court erred in failing to merge the convictions and otherwise affirm.

We begin with defendant's motion to suppress. We review the denial of a motion to suppress evidence for legal error, *State v. Warner*, 136 Or App 475, 478, 901 P2d 940 (1995), deferring to the trial court's explicit and implicit findings of historical fact if there is constitutionally sufficient evidence in the record to support them. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993); *State v. Hemenway*, 232 Or App 407, 409, 222 P3d 1103 (2009).

We state the facts consistently with the trial court's findings and conclusions. *State v. Towai*, 234 Or App 292, 228 P3d 601 (2010); *Hemenway*, 232 Or App at 409. Deschutes County Sheriff Sergeant Cima was driving behind defendant's van on Highway 97 when he noticed the van weaving in its lane and crossing the fog line. Cima activated his overhead lights to pull the van over for a traffic infraction. Defendant did not immediately stop; Cima saw movement in the van and, after 15 to 20 seconds, defendant pulled over to the shoulder. Cima approached defendant's car on the passenger side. It is undisputed that the interaction was low-key and courteous. Cima told defendant why he had been stopped, and defendant replied that he had been driving a long time and was tired. During the conversation, Cima assessed defendant's condition. After determining that defendant was not impaired, Cima told him that he was not going to issue a citation and that, if defendant's documents checked out, he could leave shortly.

Cima took defendant's license and registration to his patrol car to check for warrants. When he returned to his patrol vehicle, Cima turned off his overhead emergency lights. Dispatch told Cima that defendant's license was valid

and that there were no outstanding warrants. Before returning to defendant's van, Cima picked up a bilingual "consent to search" form, because he intended to ask defendant for consent to search the van. It is undisputed that Cima's decision to request consent to search was not related to the reason for the stop or based on reasonable suspicion.

Cima returned the documents to defendant, gave defendant a written warning, and then told him, "Everything is fine. Again, no citation issued." Defendant and Cima then had a brief conversation in which Cima asked defendant if there were any other people in the vehicle. Defendant replied, "Just us. No one else." Cima noticed that the back seat of the van was piled high with blankets in zipped plastic cases, and defendant explained that he was taking the blankets as gifts to friends in Washington. Cima replied, "Great. Good enough," and turned to return to his vehicle.

At that point, defendant believed that he was "100 percent" free to leave, and he began to put his documents away. Within a few seconds, Cima turned around and came back to defendant's van and asked for permission to search. Defendant said, "No problem," and signed the consent to search form. The search revealed evidence of the charged crimes, specifically, several forged resident alien forms.

Defendant moved to suppress the evidence, contending that the time between Cima's return of the documents and his request to search the van did not provide a sufficient temporal break to end the traffic stop and that, in the absence of reasonable suspicion of criminal activity, the request to search the van was an unlawful extension of the stop. The trial court denied the motion, concluding that, despite the brevity of the break, when the officer returned defendant's documents and started to walk away from the van, the stop had ended. The trial court relied especially on defendant's own testimony that, when the officer had returned his documents, defendant felt "100 percent" free to leave:

> "And I'll note specifically a portion of the testimony that I found particularly important in making my decision, and that was a question asked of the defendant when he—I

believe it was on cross-examination * * * when Deputy Cima walked away from the car after returning all of the documents, did he feel that he was free to leave, and his answer was '100 percent.'

"So I think the critical fact here is that at that point, the defendant believed that the traffic stop was concluded and that he was free to go. And what makes this a close call is the time frame involved. A short time after that, * * * Deputy Cima returned and asked the defendant for consent to search the vehicle. And consent was granted. I don't think that was seriously contested. I think the issue in this case is whether or not * * * the consent [was] requested in a manner that exceeded the permissible scope of the traffic stop.

"And I think what's important here is that in defendant's mind, the traffic stop was over. It had concluded. He had the documents returned to him. And that, as he testified, he felt 100 percent free to leave. And it was after that that the officer recontacted him and asked him for consent to search the vehicle. At that point, consent was granted."

Defendant then pleaded guilty to the charged offenses.

On appeal, defendant concedes that the initial traffic stop was lawful. Citing *State v. Hadley*, 146 Or App 166, 172, 932 P2d 1194 (1997), defendant instead argues that the temporal break between Cima's return of defendant's documents and his request for defendant's consent to search was not sufficient to end the traffic stop and that, in the absence of reasonable suspicion of criminal activity, Cima's further questioning after he had decided not to issue a citation violated defendant's rights under Article I, section 9, of the Oregon Constitution, and the Fourth Amendment to the United States Constitution.[1] In defendant's view, even if he briefly subjectively believed that he was free to leave, that belief proved false when, seconds later, the officer asked for consent to search. Accordingly, defendant asserts, because he

---

[1] Article I, section 9, provides, in part:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure[.]"

The Fourth Amendment provides, in part:

"The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated[.]"

was not actually free to leave, Cima's request for consent occurred during an unlawful extension of the stop.

Initially, we reject defendant's reliance on *Hadley*, in which we held that a traffic stop continues "until the motorist has had a 'real time' opportunity to move on." 146 Or App at 172. In *State v. Hallmark*, 157 Or App 538, 542, 973 P2d 908 (1998), we expressly disavowed the test set forth in *Hadley*. We said that the proper methodology for determining when a stop ends under ORS 810.410 is a two-part inquiry as set forth by the Supreme Court in *State v. Toevs*, 327 Or 525, 532, 964 P2d 1007 (1998)—the same test that applies in the context of a constitutional violation under Article I, section 9. 327 Or at 534 (the analysis under either authority is substantially the same).

We turn, then, to that constitutional issue. A stop under Article I, section 9, occurs

> "(a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) whenever an individual believes that (a), above, has occurred and such belief is objectively reasonable in the circumstances."

*State v. Holmes*, 311 Or 400, 409-10, 813 P3d 28 (1991). The "pivotal factor," the court explained, "is whether the officer, even if making inquiries a private citizen would not, has otherwise conducted himself in a manner that would be perceived as a nonoffensive contact if it had occurred between two ordinary citizens." *Id.* at 410.

In this case, defendant contends that this case involved a *Holmes* "type (a)" stop. According to defendant, despite his admitted belief that he was free to leave, when Cima asked for consent to search, the officer intended to restrict defendant's freedom of movement and did in fact objectively restrict defendant's movement.

In *State v. Ashbaugh*, 225 Or App 16, 23, 200 P3d 149 (2008), *rev allowed*, 346 Or 257 (2009), we stated that the court determines whether a "type (a)" stop has occurred without reference to the subjective belief of the defendant; the only relevant state of mind is the officer's, *viz.*, did the officer

intentionally act so as to significantly restrict, interfere with, or otherwise deprive an individual of that individual's liberty or freedom of movement? Whether the officer's conduct significantly restricted, interfered with, or otherwise deprived the individual of liberty or freedom of movement is determined based on an objective reasonable person standard. *State v. Blair/Vanis*, 171 Or App 162, 171, 14 P3d 660 (2000), *rev den*, 332 Or 137 (2001).

Our analysis is further aided by the Supreme Court's more recent decision in *State v. Rodgers/Kirkeby*, 347 Or 610, 621-22, 227 P3d 695 (2010), which was published after this case was submitted. In *Rodgers/Kirkeby*, the court said that police inquiries during the course of a traffic stop (including requests to search a person or vehicle) "are not searches and seizures and thus by themselves ordinarily do not implicate Article I, section 9." *Id.* at 622. In contrast, the court said, "police conduct that involves physical restraint or a show of authority that restricts an individual's freedom of movement typically does implicate Article I, section 9." *Id.* The court noted that a traffic stop is not an ordinary police-citizen encounter because, in contrast to a person on the street who may end the encounter at any time, a motorist stopped for a traffic infraction is not free to end the encounter when he or she chooses:

"Police authority to detain a motorist dissipates when the investigation reasonably related to that traffic infraction, the identification of persons, and the issuance of a citation (if any) is completed or reasonably should be completed. Other or further conduct by the police, beyond that reasonably related to the traffic violation, must be *justified* on some basis other than the traffic violation."

*Id.* at 623 (emphasis in original). The court reiterated the constitutional principles that apply to traffic stops:

"Police conduct during a noncriminal traffic stop does not further implicate Article I, section 9, so long as the detention is limited and the police conduct is reasonably related to the investigation of the noncriminal traffic violation. However, a police search of an individual or a vehicle during the investigation of a noncriminal traffic violation, without probable cause and either a warrant or an exception to the warrant requirement, violates Article I, section

9. Because police inquiries during a traffic stop are neither searches nor seizures, police inquiries in and of themselves require no justification and do not necessarily implicate Article I, section 9. *However, police inquiries unrelated to a traffic violation, when combined with physical restraint or a police show of authority, may result in a restriction of personal freedom that violates Article I, section 9.*"

*Id.* at 624 (emphasis added).

In *Rodgers/Kirkeby*, when the officer returned to defendant Rodgers's car after completing a records check, he had sufficient information to issue a citation and conclude the encounter. Rather than issuing a citation and concluding the stop, however, the officer began asking the defendant questions unrelated to the traffic stop and then asked to search the vehicle. *Id.* at 626. The continued inquiry and request to search were made by one officer from the driver-side window while a second officer was stationed at the passenger side of the car. The defendant had not been told that he was free to leave, and he did not know that the officer's questions were unrelated to the traffic investigation and that his cooperation was no longer required. The court concluded that

"[u]nder the totality of the circumstances, * * * [the first officer's] position at the driver-side window and [the second officer's] presence on the passenger side of the car was a sufficient 'show of authority' that, in combination with the unrelated questions concerning items in the car and the request to search the car, resulted in a significant restriction of defendant's freedom of movement."

*Id.* at 627.

■ The facts in this case stand in marked contrast to those of *Rodgers/Kirkeby*. Cima returned defendant's documents to him, gave him a written warning, and walked away. At that point defendant himself conceded that he felt "100 percent" free to leave the scene. When Cima turned around and returned to defendant's vehicle, no other officer was present. There was no physical restraint on defendant, and nothing blocked his van. The patrol car's overhead emergency lights were not activated. It was only at that point that Cima asked for consent to search. By the time that Cima

asked for consent to search, then, the stop had ended, and the request itself constituted a mere inquiry of the sort that the court in *Rodgers/Kirkeby* held does not implicate the constraints of Article I, section 9.

Defendant insists that the officer's request for consent was, in and of itself, a show of authority that prevented him from buckling his seat belt so that he could lawfully depart. In *Rodgers/Kirkeby*, however, the court explained that a police inquiry such as a request for consent is not by itself a show of authority; for a police inquiry to trigger the protections of Article I, section 9, the inquiry must be combined with "physical restraint" or some other show of police authority of the sort that restrains personal freedom. *Id.* at 624. We conclude that the trial court did not err in denying defendant's motion to suppress under Article I, section 9.

■    We turn to defendant's contention that the trial court erred in failing to merge three of his convictions for possession of a forged instrument into a single conviction. The three counts of possession of a forged instrument, Counts 1 through 3, were based on a single incident—the described stop—in which defendant was found to be in possession of three separate blank resident alien cards.[2] At sentencing, defendant argued that the convictions should merge. The sentencing court rejected the contention.

On appeal, defendant argues that, because the charges arose from that single incident, the convictions should merge under ORS 161.067(3).[3] The state does not dispute that the sentencing court should have merged the convictions. *State v. Merrick*, 224 Or App 471, 197 P3d 624 (2008) (merger required when the defendant was convicted of

---

[2] The conviction on Count 4 involved possession of a different type of forged instrument, and defendant does not contend that it too should merge.

[3] ORS 161.067(3) provides, in part:

"When the same conduct or criminal episode violates only one statutory provision and involves only one victim, but nevertheless involves repeated violations of the same statutory provision against the same victim, there are as many separately punishable offenses as there are violations, except that each violation, to be separately punishable under this subsection, must be separated from other such violations by a sufficient pause in the defendant's criminal conduct to afford the defendant an opportunity to renounce the criminal intent."

multiple charges of forgery based on a single incident in which the defendant was found to be in possession of multiple instruments). Instead, the state argues that defendant's contention is not reviewable on appeal, because he pleaded guilty. In the alternative, the state argues that, by failing to raise the issue to the trial court until sentencing, defendant failed to preserve it for appeal.

We rejected both of the state's contentions in *State v. Bowers*, 234 Or App 301, 227 P3d 822, *rev den*, 348 Or 621 (2010) (claim that convictions should merge constitutes contention that disposition exceeds maximum allowable by law under ORS 138.050 and is preserved when raised at time of sentencing), and *State v. Sumerlin*, 139 Or App 579, 913 P2d 340 (1996) (a disposition exceeds the maximum allowed by law if it is not imposed consistently with statutory requirements). We therefore conclude that the trial court erred in not merging three of defendant's convictions for possession of a forged instrument, Counts 1 through 3, and remand for entry of a single forgery conviction on those counts.

Reversed and remanded for entry of judgment reflecting a single conviction of possession of a forged instrument on Counts 1 through 3 and for resentencing; otherwise affirmed.