No. 1          January 10, 2013          129

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Respondent on Review*,

*v.*

LELAND JAY HEMENWAY,
*Petitioner on Review*.

(CC 071107; CA A136981; SC S059085 (Control))

STATE OF OREGON,
*Petitioner on Review*,

*v.*

LELAND JAY HEMENWAY,
*Respondent on Review*.

(S059392)

(Consolidated)

On review from the Court of Appeals.*

Argued and submitted November 14, 2011, at Reynolds High School, Troutdale, Oregon.

Rolf Moan, Assistant Attorney General, Salem, argued the cause and filed the brief for State of Oregon, respondent on review/petitioner on review. With him on the brief were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor General.

Peter Gartlan, Chief Defender, Office of Public Defense Services, Salem, argued the cause and filed the brief for Leland Jay Hemenway, petitioner on review/respondent on review.

Before Balmer, Chief Justice, Kistler, Walters, Linder, and Landau, Justices, and Durham and De Muniz, Senior Judges, Justices pro tempore.**

———————

* Appeal from Tillamook County Circuit Court, Rick W. Roll, Judge. 232 Or App 407, 222 P3d 1103 (2009).

** Brewer and Baldwin, JJ., did not participate in the consideration or decision of this case.

BALMER, C. J.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.

Landau, J., concurred and filed an opinion.

Walters, J., dissented and filed an opinion, in which De Muniz, Senior Judge, Justice pro tempore, joined.

**BALMER, C. J.**

This case requires us to consider once again the circumstances in which a person's voluntary consent to a search is the result of exploitation of prior illegal police conduct—leading to the exclusion of the evidence obtained—and when it is not. The state charged defendant with possession of methamphetamine. Before trial, defendant filed a motion to suppress evidence seized by the police, arguing that his consent to search was the product of an illegal seizure and, therefore, that the evidence was inadmissible under Article I, section 9, of the Oregon Constitution.[1] The trial court denied the motion. Defendant entered a conditional guilty plea, reserving his right to appeal the denial of his motion to suppress. The Court of Appeals reversed, relying in part on our decision in *State v. Hall*, 339 Or 7, 115 P3d 908 (2005), and holding that, if the stop was unlawful, the evidence from the search was presumptively obtained through exploitation of the earlier unlawful conduct. *State v. Hemenway*, 232 Or App 407, 222 P3d 1103 (2009). For the reasons that follow, we reverse the decision of the Court of Appeals. In doing so, we modify the exploitation analysis announced in *Hall*.

## BACKGROUND

We take the facts from the Court of Appeals opinion.

"In April 2007, deputies Orella and Russell responded to a call from Taylor, defendant's girlfriend, regarding Taylor residence's electric power and the whereabouts of Taylor's son. The deputies, in separate cars, arrived at Taylor's residence just before midnight. Both deputies parked in the driveway behind defendant's truck, blocking the truck's exit route. The deputies were in uniform, carrying guns, and driving marked sheriff's vehicles. Defendant and Taylor were both outside the house when the deputies arrived. Deputy Orella approached Taylor and instructed

---

[1] Article I, section 9, of the Oregon Constitution provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

defendant to go talk to Deputy Russell. Orella then informed Russell that he had observed a rifle in defendant's truck.

"Defendant met Russell near the back of the truck and voluntarily explained that he was in the process of moving out of the house and many of his belongings were in the truck, including the rifle and a handgun. Russell asked defendant if he was a felon; defendant responded that he was not. In order to verify defendant's assertion that he was not a felon, Russell asked for defendant's name and date of birth. Defendant provided the information to Russell. Defendant asked Russell's permission to have a cigarette. Russell said that he could, but that he wanted to search defendant to 'ease his mind.' Defendant agreed to that search. Russell found a breath mint tin in one of defendant's pockets. The trial court found that Russell first asked if he could open the tin, and, after defendant agreed, Russell discovered a methamphetamine pipe and a baggie that Russell suspected contained methamphetamine residue. Russell placed defendant under arrest and advised him of his *Miranda* rights.

"Russell then asked defendant if he had more drugs in the house. Defendant admitted that there might be and consented to Russell retrieving the drug-related items from the house. Defendant accompanied Russell into the house and pointed out where the methamphetamine paraphernalia was, which Russell then located and seized.

"Before trial, defendant moved to suppress all evidence obtained from the warrantless search of his person and residence and his inculpatory statements made to the deputies. Defendant argued that the deputies' conduct before his grants of consent and statements constituted an unlawful stop under Article I, section 9, of the Oregon Constitution and that Russell exploited the unlawful stop when he obtained defendant's consents and statements. The trial court determined that defendant was not 'seized' by Russell and that defendant's consents were voluntary. Defendant entered a conditional plea of guilty, reserving the right to appeal the trial court's denial of his motion to suppress."

*Id.* at 409-10.

On appeal, defendant argued that the trial court erred by holding that defendant had not been seized; defendant did not challenge the trial court's finding that

he voluntarily had consented to the searches. The Court of Appeals determined that (1) the officers did not have reasonable suspicion that defendant had engaged in criminal activity; and (2) a reasonable person in defendant's position would have believed that he had been stopped, "[g]iven that defendant was physically blocked from exiting in his truck by the deputies' cars, that he was told to speak to Russell and had to alter his course to do so, and that Russell asked if defendant was a felon and subsequently asked for his verifying information." *Id*. at 415. The court nevertheless remanded defendant's case for the trial court to determine whether defendant subjectively had believed that he had been stopped. *Id*. Under this court's case law at the time of the Court of Appeals decision, a seizure for purposes of Article I, section 9, occurred whenever an individual subjectively "believe[d]" that a law enforcement officer had restrained that individual's liberty or freedom of movement and such belief was objectively reasonable. *See State v. Holmes*, 311 Or 400, 409-10, 813 P2d 28 (1991), *overruled in part by State v. Ashbaugh*, 349 Or 297, 316, 244 P3d 360 (2010).

Turning to the question whether, if defendant had been unlawfully stopped, the evidence from the consent searches should have been suppressed, the Court of Appeals held that it should. *Hemenway*, 232 Or at 416-18. Applying *Hall*, the court held that the state had failed to show that defendant's voluntary consents were attenuated from the potentially illegal stop. For that reason, if the stop was unlawful, the evidence was obtained through exploitation and should have been suppressed.

Defendant and the state each requested an extension of time to file their respective petitions for review pending this court's decision in *Ashbaugh*. In that case, we modified the test for whether the police have seized a person for purposes of Article I, section 9, eliminating the subjective component of the test. *Ashbaugh*, 349 Or at 316. After the opinion in *Ashbaugh* issued, defendant and the state both petitioned for review in these cases. Defendant argued that, under *Ashbaugh*, this court should reverse the part of the Court of Appeals opinion that remanded his case to the trial court for an investigation into his subjective

belief regarding whether he had been stopped and should order the suppression of the drug evidence under *Hall*. The state conceded that defendant had been stopped under Article I, section 9, as explained in *Ashbaugh*, but asserted that *Hall* was incorrectly decided and should be overruled. We consolidated the petitions and allowed review.

On review, the state argues that *Hall*—discussed further below—was incorrectly decided because a voluntary consent search is necessarily "reasonable" under Article I, section 9, of the Oregon Constitution and, thus, any evidence seized pursuant to a voluntary consent search is admissible regardless of any prior illegal conduct by law enforcement. Defendant responds that *Hall* was correctly decided and that, under *Hall*, the evidence seized pursuant to defendant's consent must be suppressed because the evidence was derived from the illegal stop.

We begin with a summary of the relevant parts of *Hall*. In that case, as here, the defendant consented to a search voluntarily after being stopped by police, and the police discovered drugs. The defendant moved to suppress, arguing that the stop had been illegal and that that illegality required suppression of the evidence despite his voluntary consent to the search. The trial court denied the motion, but the Court of Appeals reversed and ordered the evidence suppressed. 339 Or at 10-12. The state petitioned for review, arguing, among other things, that the defendant's voluntary consent had severed the causal link between the illegal police conduct and the evidence. Thus, in the state's view, the exclusionary rule did not bar the evidence, because the illegal conduct did not bring the evidence to light. *Id*. at 14. On review, the majority of this court first determined that the stop was illegal under Article I, section 9. *Id*. at 19. As discussed below, the majority then addressed the proper framework for determining whether the evidence gleaned from the consent search nevertheless must be suppressed because of the illegal stop.

The majority in *Hall* began by outlining the history of the exclusionary rule in Oregon and analyzing this court's past treatment of consent searches. The exclusionary rule is constitutionally mandated and serves

to vindicate a defendant's personal right to be free from unreasonable searches and seizures. *Id*. at 24. The federal exclusionary rule, by contrast, is premised on deterring police misconduct. *Id.* at 23. The goal of the exclusionary rule in Oregon is to "restore a defendant to the same position as if 'the government's officers had stayed within the law'" by suppressing evidence obtained in violation of the defendant's rights. *Id*. at 24 (quoting *State v. Davis*, 295 Or 227, 234, 666 P2d 802 (1983)).

　　　The majority noted that illegal police conduct may negate a defendant's consent to search and require suppression of evidence in two ways. First, the consent itself may be "involuntary" if the illegal police conduct overcame the defendant's free will, and the consent instead resulted from "police coercion." *Id*. at 20. Second, evidence gained through a voluntary consent search still may require suppression if the defendant's consent to search "derived from" the prior illegal police conduct. *Id*. at 21. The majority rejected the state's argument that only the voluntariness inquiry was necessary, stating that, even when a defendant voluntarily consents,

> "this court's case law * * * makes clear that Article I, section 9, also requires the consideration of the effect of the unlawful police conduct upon the defendant's decision to consent, even if that conduct did not rise to the level of overcoming the defendant's free will."

*Id*. at 32. In particular, the majority relied on *State v. Kennedy*, 290 Or 493, 624 P2d 99 (1981), and *State v. Rodriguez*, 317 Or 27, 854 P2d 399 (1993), noting that those cases borrowed from the exploitation analysis that the United States Supreme Court announced in *Wong Sun v. United States,* 371 US 471, 83 S Ct 407, 9 L Ed 2d 441 (1963), to analyze whether Article I, section 9, required suppression of evidence obtained through valid consent searches.[2] Although neither *Kennedy* nor *Rodriguez* required suppression on the facts of those cases, the majority in

---

[2] The majority also discussed and disavowed parts of *State v. Quinn*, 290 Or 383, 623 P2d 630 (1981), which had relied extensively on *Wong Sun.* The *Hall* court's rejection of the result in *Quinn* was based on the difference between the state and federal exclusionary rules and *Quinn*'s questionable application of *Wong Sun*, but *Hall* did not reject *Quinn*'s use of the *Wong Sun* exploitation analysis. *Hall*, 339 Or at 26-30.

*Hall* noted that both cases analyzed the issue as whether the defendant's voluntary consent "derived from" the prior illegal seizures. 339 Or at 30-32. The majority determined that "consent is insufficient to establish the admissibility of evidence from a warrantless search if the state cannot prove that the consent was independent of, or only tenuously related to, any preceding violation of the defendant's rights under Article I, section 9." *Id*. at 27 (citing *Rodriguez*, 317 Or at 41-42).

The majority in *Hall* summarized its conclusions as follows:

> "After a defendant shows a minimal factual nexus between unlawful police conduct and the defendant's consent, then the state has the burden to prove that the defendant's consent was independent of, or only tenuously related to, the unlawful police conduct. Deciding whether the state has satisfied that burden requires a fact-specific inquiry into the totality of the circumstances to determine the nature of the causal connection between the unlawful police conduct and the defendant's consent. A causal connection requiring suppression may exist because the police sought the defendant's consent solely as the result of knowledge of inculpatory evidence obtained from unlawful police conduct. A causal connection requiring suppression also may exist because the unlawful police conduct, even if not overcoming the defendant's free will, significantly affected the defendant's decision to consent. Although determining the existence of such a causal connection requires examination of the specific facts at issue in a particular case, we view several considerations to be relevant to that determination, including (1) the temporal proximity between the unlawful police conduct and the defendant's consent, (2) the existence of any intervening circumstances, and (3) the presence of any circumstances—such as, for example, a police officer informing the defendant of the right to refuse consent—that mitigated the effect of the unlawful police conduct."

*Id*. at 34-35.

Justice Durham filed a separate opinion, joined by Justice Gillette, concurring in part and dissenting in part. The dissent agreed that the defendant had been illegally stopped, but disagreed that that prior illegality should result in the suppression of the evidence gained through the

consent search. The dissent asserted that the defendant's "voluntary consent to the search demonstrates that the disputed evidence came to light as the result of a reasonable, not unreasonable, search." *Id*. at 39 (Durham, J., concurring in part and dissenting in part). The dissent took issue with the majority's reliance on *Rodriguez*, 317 Or 27, which the dissent characterized as incorrectly focusing on the police decision to seek consent, "rather than the voluntariness of the defendant's consent." *Id*. at 50. In the dissent's view, the inquiry into the voluntariness of a defendant's consent takes into account any prior illegal conduct by the police. *Id*. at 46. And, a voluntary consent to search fully vindicates the defendant's rights under Article I, section 9, because the evidence was gained as a result of that consent and not by way of the prior illegality. *Id*. at 51.

## CLARIFICATION OF *HALL*

The state argues that we should overrule our 2005 decision in *Hall*, 339 Or 7. "[T]he principle of *stare decisis* means that the party seeking to change a precedent must assume responsibility for affirmatively persuading us that we should abandon that precedent." *State v. Ciancanelli*, 339 Or 282, 290, 121 P3d 613 (2005). The state thus has the burden of demonstrating that we should reconsider and reject the rule announced in *Hall*. The state argues, among other things, that *Hall* failed to apply this court's "usual paradigm" for analyzing constitution provisions; that the decision erroneously construed the text of Article I, section 9; and that it departed from earlier case law. We have considered—and we reject—the state's argument that *Hall* suffers from all of the deficiencies that the state asserts. We also note that, in seeking to overrule *Hall*, the state relies in substantial part on arguments that were, in fact, raised by the *Hall* dissent and considered and rejected by the majority.

Although we reject the state's assertion that *Hall* articulated an impermissible construction of Article I, section 9, we agree that *Hall*'s test for exploitation is flawed in some respects and bears refinement. The state argues that internal contradictions mar both steps of *Hall*'s exploitation test and make the test difficult in application and uncertain

in result. The state is correct that, in practice, the *Hall* test has caused some confusion. Parties and the courts have struggled to determine when a defendant has met his or her burden of establishing a "minimal factual nexus" and whether the police exploited their illegal conduct to obtain a defendant's consent to search. We turn to those issues.

We begin with a review of the relevant legal principles. In the context of *Hall* and in this case, the inquiry into whether evidence obtained pursuant to a consent search must be suppressed involves three overlapping issues: (1) whether the initial stop was lawful; (2) whether the defendant's consent to the search was voluntary; and (3) assuming that the stop was unlawful and the consent voluntary, whether the police exploited the illegal stop to obtain the disputed evidence.

The first issue is the lawfulness of the police-citizen encounter. There is nothing constitutionally suspect under Article I, section 9, about police engaging a citizen in conversation and then requesting that citizen's consent to search. *Ashbaugh*, 349 Or at 308-09. In contrast to "mere conversation," which does not implicate Article I, section 9, an officer "stops" an individual—raising potential constitutional issues—when the officer "intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement." *Id*. at 308-09, 316. Before stopping an individual, Article I, section 9, requires the police to have reasonable suspicion that the individual is involved in criminal activity. In the absence of reasonable suspicion (or some other permissible concern, such as officer safety), the individual has the right to be free from police interference and may terminate an encounter with police at will. *See id*. at 308-09.

The second issue is whether the consent to search was voluntary. The proper test for voluntariness of consent "is to examine the totality of the facts and circumstances to see whether the consent was given by defendant's free will or was the result of coercion, express or implied." *Kennedy*, 290 Or at 502 (citing *Schneckloth v. Bustamonte*, 412 US 218, 226-27, 93 S Ct 2041, 36 L Ed 2d 854 (1973)). To prove the voluntariness of a consent to search in the context of

an illegal stop, the state must prove that the defendant's consent was the product of his own free will, rather than the result of coercion. *State v. Wolfe*, 295 Or 567, 572, 669 P2d 320 (1983); *see also State v. Stevens*, 311 Or 119, 136, 806 P2d 92 (1991) (consent to search voluntary when no evidence that "the police intimidated or coerced defendant in any way"); *Kennedy*, 290 Or at 504, 506 (consent to search voluntary in light of "an almost total absence of coercive factors").

The specific focus of *Hall* and of this case is the third part of the inquiry: If the police-citizen encounter was unlawful, but the consent to search was voluntary, the issue becomes whether the police exploited their illegal conduct to obtain the consent to search and, by that means, the evidence in question. In *Wong Sun*, the United States Supreme Court described exploitation as "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." 371 US at 488 (internal quotation marks and citation omitted). Since at least *Kennedy*, this court has referred to and used the exploitation analysis announced in *Wong Sun* in the context of determining whether evidence obtained through voluntary consent searches should be suppressed. *See Kennedy*, 290 Or at 501 ("[E]vidence [gained from a consent search during or after alleged police illegality] is to be suppressed only if it is found that the consent was gained by exploitation of the illegality or that defendant's free will was tainted by the illegal police conduct." (Citing other state and federal jurisdictions that apply *Wong Sun* to consent searches.)). The United States Supreme Court also has employed exploitation analysis in the context of consent searches, even when the consent was "voluntary," in the sense that it was not coerced. *See, e.g.*, *Florida v. Royer*, 460 US 491, 103 S Ct 1319, 75 L Ed 2d 229 (1983) (voluntary consent to search tainted by illegal detention by police).

The relationship between the voluntariness of consent and exploitation, of course, is a close one: often, when the circumstances support the determination that consent was voluntary, they also will support the conclusion that

there was no exploitation of any prior police misconduct, and the converse is also true. Yet it is important to emphasize that the tests are not identical and that they address separate concerns. As Professor LaFave notes,

> "While there is a sufficient overlap of the voluntariness and [exploitation] tests that often a proper result may be reached by using either one independently, it is extremely important to understand that (i) the two tests are not identical, and (ii) consequently the evidence obtained by the purported consent should be held admissible only if it is determined that the consent was *both* voluntary and not an exploitation of the prior illegality."

Wayne R. LaFave, 4 *Search and Seizure* § 8.2(d), 76 (4th ed 2004) (emphasis in original; footnote omitted). We agree. Applying both the tests for voluntariness of consent and for exploitation is necessary to vindicate a defendant's right to be free from unreasonable search and seizure. When the police stop an individual without reasonable suspicion, the individual's liberty is restrained in violation of Article I, section 9. Because the person stopped is unable to terminate the interaction with police, he or she is subject to police authority in excess of constitutional bounds and is thereby placed at a disadvantage relative to the constitutional position that he or she would have occupied absent the illegal police interference. Exploitation analysis recognizes that police conduct that constitutes an illegal stop may fall short of coercing a defendant to consent to a subsequent request to search, but nevertheless may require suppression because the police took advantage of information gained from their illegal conduct to obtain consent—an advantage that they would not have had had the police stayed within the bounds of the law. *Hall*, 339 Or at 27-28. It is that exploitation of the prior police illegality that must be remedied (or vindicated). *See State v. Sargent*, 323 Or 455, 462-63, 918 P2d 819 (1996) (suppression of evidence required only when the evidence is tainted by the constitutional violation); *State v. Williamson*, 307 Or 621, 626, 772 P2d 404 (1989) (search not valid when consent is "obtained under the pressure of police action that became available to police only by the prior unauthorized conduct").

With that background in mind, we turn to the exploitation test articulated in *Hall*. As noted, *Hall*

announced a two-part test for determining whether evidence acquired from a voluntary consent search must be suppressed because the consent was derived from an illegal seizure. First, the defendant must establish a "minimal factual nexus—that is, at minimum, the existence of a 'but for' relationship—between the evidence sought to be suppressed and prior unlawful police conduct." 339 Or at 25. Once the defendant establishes that causal link, the burden shifts to the state to prove that the evidence nevertheless is admissible because "the defendant's consent was independent of, or only tenuously related to, the unlawful police conduct." *Id*. at 34-35.

For the reasons that follow, we disavow the "minimal factual nexus" part of the *Hall* test and instead hold that, when a defendant has established that an illegal stop occurred and challenges the validity of his or her subsequent consent to a search, the state bears the burden of demonstrating that (1) the consent was voluntary; and (2) the consent, even if voluntary, was not the product of police exploitation of the illegal stop. In deciding whether the voluntary consent was a product of police exploitation of the illegal stop, the court must evaluate whether the police took advantage of the illegal aspects of the earlier police behavior to obtain consent or whether other circumstances were sufficient to purge the taint of the prior illegality on the evidence that the police ultimately obtained. As noted in *Hall*, 339 Or at 44, the state also may prove that the evidence is admissible by showing that the evidence was gained through an independent, lawful source or that the evidence inevitably would have been discovered by the police using lawful procedures.

As discussed further below, we disavow the "minimal factual nexus" part of the *Hall* test because it was drawn from a case that arose in a significantly different procedural context, and it did not take into account a relevant statute. Moreover, since this court issued *Hall*, the test has been unevenly applied and, apparently, has proved confusing to lawyers and judges.

*Hall* adopted the "minimal factual nexus" component of its test from *State v. Johnson*, 335 Or 511, 73 P3d 282 (2003). In that case, the defendant sought to

suppress evidence that had been seized illegally but then later "reseized" pursuant to a warrant. The state asserted that the warrant was "entirely independent of, and was not obtained by exploitation of, the previous illegality." *Id*. at 519. Ordinarily, a search performed under authority of a warrant is subject to a presumption of regularity, and the party challenging the evidence bears the burden to prove the unlawfulness of the search or seizure. *Id*. at 520-21. Before addressing the state's exploitation argument, the court addressed which party bore the burden with regard to proving exploitation or its absence. Because of the presumption of regularity when the police act under authority of a warrant, the court concluded that the defendant had an initial burden to establish a "factual nexus" between prior illegal police conduct and the evidence gained pursuant to an independently valid warrant. *Id.* at 521. Once a defendant demonstrates that nexus, the court in *Johnson* wrote, "the presumption of regularity [of the warrant] is undermined and the burden of proof fairly may be shifted to the government to show that the evidence is not tainted by the misconduct." *Id.*

This court's reliance in *Hall* on *Johnson* was misplaced. By statute, whenever a defendant challenges evidence seized following a warrantless search, the state bears the burden of proving "by a preponderance of the evidence the validity of the search." ORS 133.693(4); *State v. Tucker*, 330 Or 85, 87, 997 P2d 182 (2000). When the police conduct a search and seize evidence without a warrant, as in *Hall* and in this case, there is no presumption of regularity to overcome, because there was no warrant and, thus, there is no need for a threshold showing by the defendant to shift the burden to the state. The state already has the burden to prove that the warrantless search was valid.

Moreover, under the *Hall* test, parties were required to first focus on whether or not a "minimal factual nexus" was present, rather than examining the more central issues of (1) whether the police had acted unlawfully in making the initial stop, and (2) whether the later consent to search and subsequently discovered evidence were obtained through exploitation of the unlawful police conduct. However, exploitation analysis already considers the existence of a

"minimal factual nexus," because determining whether the police exploited their unlawful conduct to gain the disputed evidence necessarily requires an examination of the causal connection between the police conduct and the defendant's consent. Accordingly, the "minimal factual nexus" test is not analytically significant in determining whether the consent was the product of the illegal police conduct, such that evidence obtained pursuant to that search must be suppressed. Additionally, it is unnecessary to shift the burden of proving lack of exploitation to the state because, as noted, the state already bears the burden of proving that evidence obtained from a warrantless search is valid.

Because the "minimal factual nexus" test adopted in *Hall* does not have firm grounding in our case law and is inconsistent with ORS 133.693(4)—and because the application of the test has been unclear in our cases since *Hall* and has proved confusing to litigants and the courts— we disavow that part of the *Hall* analysis.

We now turn to the remaining—and more central— part of the *Hall* exploitation test. That test requires the state to prove "that the defendant's consent was independent of, or only tenuously related to, the unlawful police conduct." 339 Or at 35. *Hall* posited two scenarios that require suppression:

> "A causal connection requiring suppression may exist because the police sought the defendant's consent solely as the result of knowledge of inculpatory evidence obtained from unlawful police conduct. A causal connection requiring suppression also may exist because the unlawful police conduct, even if not overcoming the defendant's free will, significantly affected the defendant's decision to consent."

*Id*. *Hall* identified three factors for assessing whether the causal connection "significantly affected" the defendant's decision to consent and thus requires suppression:

> "(1) the temporal proximity between the unlawful police conduct and the defendant's consent, (2) the existence of any intervening circumstances, and (3) the presence of any circumstances—such as, for example, a police officer informing the defendant of the right to refuse consent— that mitigated the effect of the unlawful police conduct."

*Id*.

The state asserts that the *Hall* test does not afford sufficient weight to a defendant's decision to voluntarily relinquish his or her Article I, section 9, right to be free from unreasonable governmental searches and seizures because, under *Hall*, suppression almost always will be required when consent is granted in close temporal proximity to an illegal stop. In *Hall* itself, the court required suppression, "[g]iven the close temporal proximity between the illegal detention and defendant's consent, and the absence of any intervening circumstances or other circumstances mitigating the effect of that unlawful police conduct." *Id*. at 36. This court's cases following *Hall* have reached similar results. *See, e.g.*, *State v. Rodgers/Kirkeby*, 347 Or 610, 630, 227 P3d 695 (2010) (evidence suppressed under *Hall* when consent granted in close temporal proximity to illegal stop and state failed to demonstrate intervening or mitigating circumstances); *State v. Ayles*, 348 Or 622, 637-39, 237 P3d 805 (2010) (same).

We agree that the exploitation test announced in *Hall* does not account sufficiently for the importance of a defendant's voluntary consent to search. Our cases demonstrate that, in some situations, a defendant's voluntary consent itself may be sufficient to demonstrate that the search was reasonable and permitted, notwithstanding the prior illegality. *See Rodriguez*, 317 Or at 41-42; *Williamson*, 307 Or at 626 (both rejecting proposition that consent "can never legitimize" a search following illegal police conduct). That legal determination—whether consent has so attenuated the connection between the prior illegal conduct and the evidence obtained in the consent search—requires a court to consider the illegal conduct that comprised the stop, the character of the consent, and the causal relationship between the two. In *Kennedy*, for example, the defendant's consent was not "tainted" by the illegal police conduct when there was an "absence of any coercive circumstances surrounding [the] defendant's consent" and the defendant volunteered consent without prompting from the officers. 290 Or at 506.

The court in *Hall* asserted that the unprompted grant of consent in *Kennedy* and a similar volunteering of consent in *Rodriguez* were intervening circumstances that cut off

the causal connection between the consent and the prior illegal conduct. *Hall*, 339 Or at 34. *Hall,* however, suggested that, had the police asked for (and obtained) the defendant's consent in *Rodriguez*—rather than the defendant having volunteered to be searched—suppression would have been required. *Id*. By asserting that an *unprompted* consent is an intervening circumstance sufficient to mitigate the taint of the prior illegality but positing that a *requested* consent on the same facts would not purge the taint, *Hall*, in effect, created a *per se* rule that evidence gained from a requested consent search always must be suppressed if that request occurs in close temporal proximity to the illegal stop and the state cannot demonstrate some breach in the causal chain.

The fact that a consent to search was unprompted or unilateral is relevant evidence of the voluntariness of the consent; as recognized in *Kennedy* and *Rodriguez*, unprompted or unilateral consent is less likely to be a product of illegal police conduct. However, the fact that an officer requested consent does not demonstrate that the officer necessarily *exploited* the prior illegal conduct to gain consent. *Rodriguez*, for example, involved a voluntary consent following an illegal arrest. The officer did not directly ask the defendant for consent to search, but he did ask the defendant if he had any drugs or guns in his apartment. *Rodriguez*, 317 Or at 41. In response to that question, the defendant said, "No, go ahead and look." *Id*. So, even if the defendant's consent in *Rodriguez* was "volunteered," that consent was, in fact, prompted by the officer's question about drugs and guns. *Rodriguez* concluded, nevertheless, that the officer "did not trade on or otherwise take advantage of the arrest to obtain defendant's consent" in light of the factual circumstances, including the manner in which the defendant had granted consent. *Id*.

Properly considered, then, a voluntary consent to search that is prompted by an officer's request can be sufficient to purge the taint of illegal police conduct. Whether the voluntary consent is sufficient to purge the taint—or whether the police exploited their illegal conduct to obtain consent—will depend on the totality of the circumstances. We reject the state's position that voluntary consent during

an unlawful stop necessarily breaks the causal chain and makes the evidence admissible, as we do defendant's argument that such consent will rarely, if ever, break the causal chain.

In an effort to clarify this complicated area of law, we again review the basic principles at issue. As noted, the overarching inquiry is whether the evidence that the state seeks to introduce must be suppressed because that evidence was obtained in violation of the defendant's constitutional rights. In the context of *Hall* and this case, where an illegal stop preceded a consent to search, that inquiry has two prongs. First, the court must assess whether the consent was voluntary. If the consent to search was not voluntary, then the evidence must be suppressed, because only a voluntary consent to search provides an exception in this context to the warrant requirement of Article I, section 9. Second, even if the consent was voluntary, the court must address whether the police exploited their prior illegal conduct to obtain the evidence. Evidence may be tainted directly by the illegal police conduct, if, for example, the police illegally stop a vehicle, allowing them to view contraband that otherwise would not have been visible, and then request the driver's consent to search the vehicle as a result of what they saw. The consent in that example does not "purge the taint" of the prior illegal stop, because the evidence has a direct causal connection to the illegal conduct.

Evidence also may be tainted if the police obtained the consent to search through less direct exploitation of their illegal conduct. As noted, *Hall* identified several factors for analyzing whether the police exploited their illegal conduct to obtain consent. Those factors include the temporal proximity between the illegal police conduct and the consent and the presence of any intervening or mitigating circumstances, such as *Miranda* warnings or other admonitions. *Hall*, 339 Or at 35, 35 n 21. Additionally, the purpose and egregiousness of the illegal police conduct is relevant to whether the police exploited that conduct to obtain the defendant's consent to search. *See Brown v. Illinois*, 422 US 590, 603-04, 95 S Ct 2254, 45 L Ed 2d 416 (1975) (identifying "the purpose and flagrancy of the official misconduct" as relevant to exploitation analysis under

the Fourth Amendment); *see also Wolfe*, 295 Or at 572 (explaining that the *Brown* exploitation factors, including "the purpose and flagrancy of the official misconduct," were relevant to determine the effect of police misconduct on the voluntariness of a defendant's consent to search). *Hall* asserted, without discussion, that "the *Brown* factor of 'purpose and flagrancy of the official misconduct' relates to only the deterrence rationale of the Fourth Amendment exclusionary rule and has no applicability to the exclusionary rule under Article I, section 9." 339 Or at 35 n 21. Although *Hall* was correct that the Oregon exclusionary rule, unlike the federal one, does not balance the value of deterrence against the costs of exclusion in determining whether evidence should be suppressed, *id.* at 23-24, we clarify here that the "purpose and flagrancy" of police misconduct nonetheless may play a role in exploitation analysis. For example, police misconduct that is intended to gain a defendant's consent may well be more likely to substantially affect that defendant's decision to consent. Likewise, particularly egregious police misconduct—such as excessive use of force in unlawfully seizing a defendant—is more likely to affect the defendant's decision to consent than more restrained police behavior. The verbal and nonverbal interactions between a defendant and the police leading up to the consent itself are relevant to whether or not the police gained consent through exploitation.

Stated in terms of the state's burden, the state must prove that the defendant's consent was sufficient to attenuate the taint of the illegal police conduct. We emphasize that the state is not required to prove that there was no causal link whatsoever between the illegal conduct and consent; rather, the state must prove that the illegal police conduct was a minor or remote cause. *See Rodriguez*, 317 Or at 40 ("Mere physical presence as a result of prior unlawful conduct does not constitute exploitation of that conduct. Exploitation occurs when the police take advantage of the circumstances of their unlawful conduct to obtain the consent to search."). As this court often has stated, but-for causation—that, as a factual matter, the illegal police conduct was a necessary link in the sequence of events that led to the consent search and the evidence—is insufficient to require suppression.

*Kennedy*, 290 Or at 500-01. If the defendant shows that he or she was stopped illegally and challenges the validity of his or her consent to search, then the state is required to prove that the police did not exploit their illegal conduct to obtain consent. If the state fails to make that showing, the evidence will be suppressed. However, if the state can show that the illegal conduct did not "significantly affect[ ]" the consent that the police obtained, then the state has established that the police did not exploit that conduct, and suppression is not required. *Hall*, 339 Or at 35.

In analyzing exploitation, it must be remembered that Article I, section 9, prohibits "unreasonable" searches and seizures. As the preceding discussion demonstrates, the test for whether a consent search conducted following an illegal stop comports with Article I, section 9, cannot be reduced to a simple formula. On the contrary, like all reasonableness determinations, whether a particular search or seizure is unreasonable necessarily depends on the facts of each case.

We again emphasize that, in addition to analyzing possible exploitation of prior police misconduct—the issue in this case—the trial court must consider whether the defendant's consent was voluntary. If the defendant's consent was not voluntary, the evidence obtained as a result of that search must be suppressed, regardless of whether any exploitation occurred. *See, e.g.*, *State v. Guggenmos*, 350 Or 243, 261-62, 262 n 8, 253 P3d 1042 (2011) (finding no reason to determine whether exploitation analysis would require suppression of evidence because determination that consent was not voluntary required suppression); *Williamson*, 307 Or at 626-27 (Carson, J., concurring) ("The validity of [the defendant's] consent determines the outcome of this case. If the consent were involuntary and, thus, invalid, the subsequent search and resulting seizure, arrest, and conviction likewise were invalid."). Because the tests for exploitation and voluntariness, while overlapping, are not identical, it is important that the trial court consider both tests in deciding whether to suppress evidence obtained in a consent search that follows an illegal stop.

We turn to several issues that the dissent raises. The dissent argues, among other things, that we have

overruled *Hall* and other cases *sub silentio*; abandoned an "objective" and "logical" test for one that is "more intrusive and less clear"; and failed to "grapple sufficiently with whether defendant's consent was * * * a product of the officer's unlawful stop and detention." 353 Or at 163-64 (Walters, J., dissenting). The dissent is wrong on each count. In this case, we clarify the rule announced in *Hall*. The state asked us to overrule *Hall*, arguing that, if a defendant who is unlawfully stopped by police voluntarily consents to a search, then that consent always makes the search reasonable and the evidence seized in the search admissible. We expressly reject that argument. Instead, we adhere to *Hall* in holding that evidence obtained from a consent search must be suppressed if the consent was obtained through exploitation of the unlawful police conduct. Under *Hall*—and under our decision today—the state must prove that "the defendant's consent was independent of, or only tenuously related to, the unlawful police conduct." *Hall*, 339 Or at 35. That analysis is consistent with our reliance in *Hall* on long-standing exploitation analysis derived from the United States Supreme Court's decision in *Wong Sun* and this court's cases following *Wong Sun,* including *Kennedy* and *Rodriguez.* In this case, as discussed above, 353 Or at 143-47, we modify the exploitation test announced in *Hall*, because we conclude that it did not give sufficient weight to a defendant's voluntary consent to a search, as well as to other factors such as the purpose and egregiousness of the police misconduct.[3]

We also disagree that *Hall* established a logical, easily applied test that we have now abandoned for one that is more intrusive and less clear. *Hall*, as noted, followed the exploitation analysis of *Wong Sun* and required consideration of "the effect of the unlawful police conduct upon the defendant's decision to consent." 339 Or at 32. That determination "requires examination of

---

[3] The dissent argues that we have "reverse[d]" and "effectively overrul[ed]" *Hall* and *Rodgers/Kirkeby*, suggesting that the results in those cases would have been different under the test that we adopt here. Whether the outcome in *Hall* and *Rodgers/Kirkeby* would have been different under the analysis set out here is speculative. The issue whether a defendant's consent was the "product" of unlawful police conduct or, put differently, whether police "exploited" their unlawful conduct to obtain consent, is necessarily dependent on the facts of the particular case and on the record developed in the trial court.

the specific facts at issue in a particular case," including "temporal proximity" between the unlawful police conduct and the defendant's consent, "intervening circumstances," and other circumstances that "mitigated the effect of the unlawful police conduct." *Id.* at 35. In this case, we point out that the focus on "temporal proximity" too easily leads to the conclusion that any consent search that occurs when a person is unlawfully stopped is invalid, when the better-framed question is whether police *exploited* the unlawful stop to obtain the consent. It is true that that test requires consideration of the totality of the circumstances of the stop and the police-citizen encounter, but that is often the case in deciding search and seizure cases.

Finally, the dissent's claim that we fail to "grapple sufficiently" with the question whether the consent given in this case was the "product" of the unlawful stop seems to contradict its argument in favor of a simpler test. As our application below of the test that we have articulated to the facts of this case demonstrates, the test is more nuanced than that announced in *Hall* and takes into account the totality of the circumstances of the encounter. As we describe below, that test provides a more careful and more full consideration of the facts that lead to a determination as to whether the consent was the "product" of the unlawful police conduct than did the test in *Hall*.

## APPLICATION

We return to the issue in this case. The Court of Appeals concluded that defendant had been stopped "when the movement of his truck was physically constrained, he was directed to move to a location to speak with a deputy, his identification was obtained, and he was questioned by the deputy." *Hemenway*, 232 Or App at 411. The court also determined that the stop was unlawful because the police had lacked reasonable suspicion that defendant was engaged in criminal conduct. *Id.* The state does not challenge the Court of Appeals' determination that defendant was illegally stopped, and we therefore do not consider that issue further.

After being stopped, defendant then consented to three searches. Defendant agrees that his consent to search

was "voluntary" in the sense used in our cases—that is, that the consent was not coerced. The only question, then, is whether defendant's consent was gained through exploitation of the illegal stop. The Court of Appeals concluded that it was, stating that, because defendant's consent had occurred "contemporaneously with the stop, with no intervening or mitigating factors[,] [i]t was therefore dependent on the unlawful stop and was not attenuated" under *Hall*. *Id*. at 416.

Because exploitation is a fact-intensive inquiry, we review the facts in some detail. Defendant's girlfriend, Taylor, called 9-1-1 regarding the whereabouts of her son, who was overdue from a visit to a friend's house, and an unspecified problem with electrical power at the house. Close to midnight and several hours after Taylor had placed the call, two officers arrived at Taylor's residence in separate vehicles. Defendant was in the process of moving out, and his truck, filled with his belongings, was parked in the driveway. The officers parked in the driveway, behind defendant's truck. Both Taylor and defendant were outside the residence when the officers arrived. Deputy Orella observed a rifle in defendant's truck and told Deputy Russell. Orella approached Taylor and directed defendant to speak with Russell.

Defendant stated that he was moving out and that he had a handgun and another firearm in the truck, in addition to the rifle. Russell asked if defendant was a felon and requested defendant's name and date of birth, which defendant provided. Russell and defendant engaged in what the trial court described as "chit-chat of an innocuous nature," and, according to Russell:

> "[Defendant] asked if he could have a cigarette, and I said that's no problem. Asked him if he'd have a problem with me searching him just to put me at ease and then he could have his hands wherever he wanted and we wouldn't have to worry about, you know, knowing if there [were] weapons or anything else on him he shouldn't have."

The trial court found that Russell was "concerned because the [d]efendant had his hands in his pockets which were bulky, had weapons in the vehicle and it was very dark at their location." Defendant consented to that search. Russell

found a small tin in defendant's pocket and asked if he could open it. Defendant again consented, and the deputy found drug paraphernalia and residue. The officer arrested defendant and gave him *Miranda* warnings. Defendant then consented to a search of the residence. The trial court found that the tone of the interactions between defendant and Russell had been "normal" prior to the arrest and that defendant had been "cooperative and forthcoming."

In this court, as noted, the state does not challenge the Court of Appeals' determination that, at the time of defendant's consents to the searches, he had just been unlawfully stopped. Accordingly, the temporal proximity factor weighs in defendant's favor. *See Ayles*, 348 Or at 637.

On the other hand, there is no evidence that the police conduct in this case was egregious; indeed, the trial court described the interaction between Russell and defendant as "amicable and casual," and the record amply supports that conclusion. Regarding the purpose of the police actions, the stop occurred around midnight during a welfare check initiated by defendant's girlfriend, who was concerned about the whereabouts of her son. Although the officers parked their cars in the driveway behind defendant's truck, there was no indication that they did so for the purpose of blocking him from leaving. Moreover, the police had observed a rifle in defendant's truck when they first arrived, before any stop occurred. Defendant then had volunteered that he was moving his possessions out of the house and that he also had a handgun and another firearm in the truck. The officers' interactions with defendant, then, were—at least initially—for the lawful purpose of investigating Taylor's call to the police. There is no indication that, when the officers stopped defendant, they did so with the purpose of searching for evidence, in contrast to *Williamson*, 307 Or at 623, 623-24 n 1.

We turn to defendant's three consents to search. As to each consent, the trial court found that there was no evidence of police coercion, either express or implied, and that each consent had been voluntary. On review, defendant does not dispute that conclusion. He argues, instead, that the police exploited their illegal stop to obtain his consent to the searches that led to the evidence upon which he was

convicted and that, under *Hall*, the evidence therefore must be suppressed. The trial court found that the police made no verbal or physical threats and did not approach defendant with weapons drawn. The trial court described defendant as "cooperative" throughout the entire encounter.

As to defendant's first consent, the trial court found that, when Russell had asked to search defendant to "ease his mind," defendant "readily agreed." Defendant testified at the suppression hearing that he consented to the first search to show that "I wasn't any kind of a threat to him." The evidence supports the trial court's conclusion that defendant had consented to "ease [Russell's] mind." The cause of the consent, then, does not appear to be the illegal conduct by the police. Rather, the setting of the interaction— the welfare check, the darkness, defendant's acknowledged possession of firearms in his truck, and defendant's desire to have a cigarette while the police conducted the welfare check—and the testimony of defendant and the officers indicates that defendant's consent was not the product of the unlawful stop. Aside from the close temporal proximity to the stop, there is no evidence that Russell exploited any aspect of the stop to obtain defendant's first consent. Accordingly, we hold that defendant's first consent was not a product of the illegal stop.

During the first search, Russell discovered a small tin and requested consent to open it. Defendant responded, according to Russell, in a "low mopey voice" that he could, and Russell discovered a methamphetamine pipe and methamphetamine residue. Russell did not threaten or cajole defendant regarding the tin; he simply requested consent to open it. There is no evidence that Russell took advantage of the fact that defendant was unable to terminate the encounter to gain defendant's consent to open the tin. Given that the first search, which led to the discovery of the tin, was valid and that there is no indication in the record that Russell exploited the stop to gain defendant's consent to open the tin, the evidence in the tin was not tainted by the prior illegal conduct. Because the drug evidence from the tin was not tainted by the unlawful stop, defendant's Article I, section 9, right to be free from unreasonable seizure would not be vindicated by suppressing that evidence.

After discovering the contraband, Russell arrested defendant and gave him *Miranda* warnings. Defendant acknowledged that there might be more drugs in the house and consented to a search of the house. Defendant then led Russell to more contraband. As noted, defendant's prior consents were valid, and, therefore, the evidence gained from those searches was not tainted by the illegal stop. Discovery of that drug evidence gave Russell probable cause to arrest defendant. Moreover, defendant had been given *Miranda* warnings before Russell requested consent to search the house. Accordingly, defendant's arrest was lawful, and defendant's voluntary consent to search the house following his arrest did not violate Article I, section 9, of the Oregon Constitution.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.

**LANDAU, J.,** concurring.

I agree with the majority's disposition and reasoning on the merits in this case. I write separately to address the state's argument that we should reexamine the search and seizure guarantee of Article I, section 9, in accordance with this court's "usual paradigm" for constitutional interpretation. The majority summarily rejects the state's argument. *State v. Hemenway*, 353 Or 129, 137-38, ___ P3d ___ (2013). I agree with the majority's ultimate conclusion, but I think that it is important to set out some of the reasons why that conclusion is correct.

The state's argument is predicated on *Stranahan v. Fred Meyer, Inc.*, 331 Or 38, 11 P3d 228 (2000), in which this court observed that "it long has been the practice of this court to ascertain and give effect to the intent of the framers" of a disputed provision of the state constitution. *Id.* at 54 (internal quotation marks omitted). The court invited litigants to present arguments that we should reconsider prior case law because of a "failure on the part of this court at the time of the earlier decision to follow its usual paradigm for considering and construing the meaning of the provision in question." *Id.* In light of what this court said in *Stranahan*, I do not fault the state for making the argument that it advances in this case. I do, however, take issue with

*Stranahan* and its stated commitment to a jurisprudence of original intent.

At the outset, I question the accuracy of *Stranahan*'s observation that such has been the longstanding practice of the court. If the court meant that there are some very old cases in which the court applied that interpretive approach, I suppose the observation is true enough.[1] But I take *Stranahan* to assert that originalism[2] is a well-established methodology that this court has consistently applied for a long time. In that regard, *Stranahan* is incorrect. Sometimes the court has applied that interpretive approach, and sometimes it has not. *See, e.g.*, *Dodd v. Hood River County*, 317 Or 172, 180-82, 855 P2d 608 (1993) (state constitutional takings clause interpreted without reference to framers' intentions); *State v. Mai*, 294 Or 269, 272, 656 P2d 315 (1982) (state constitutional compulsory process clause is construed "in the same way as the [United States] Supreme Court construed the virtually identical federal counterpart" and without reference to the intention of its Oregon framers).

That said, there certainly are a number of cases in which the court determined the meaning of the state constitution by reference to the "framers' intentions." In fact, in more than a few cases, the court has effectively limited the scope and meaning of a provision of the state constitution to whatever its framers would have understood it to mean in 1857. At the very least, there is language in a number of those opinions that has understandably led parties—such as the state in this case—to argue that our state's constitution means no more than what it meant to its framers at the time of its adoption.

---

[1] The court in *Stranahan* cited *Jones v. Hoss*, 132 Or 175, 178, 285 P 205 (1930). There are actually older cases, such as *Noland v. Costello*, 2 Or 57, 58-59 (1863), that refer to the intentions of the framers of the state constitution.

[2] I use the term somewhat loosely to refer to the mode of constitutional interpretation that regards the meaning of a provision as frozen in time in accordance with the intentions of those who adopted the constitution or with the meaning of the constitution as it would have been understood at that time. I understand that, among scholars, there is a difference between original intent and original public meaning, *see, e.g.*, Keith E. Whittington, *The New Originalism*, 2 Geo J L & Pub Pol'y 599 (2004) (describing transition among originalist scholars from emphasizing original intent to original public meaning), but that is a distinction that this court's prior cases have not consistently recognized.

    In *Lakin v. Senco Products, Inc.*, 329 Or 62, 72, 987
P2d 463 (1999), for instance, this court sweepingly declared
of the right to a jury trial guaranteed in Article I, section 17,
that "whatever the right to 'Trial by Jury' meant in 1857,
it means precisely the same thing today." In *Smothers v.
Gresham Transfer, Inc.*, 332 Or 83, 118, 23 P3d 333 (2001), to
pick another example, the court announced that the purpose
of the remedy clause of Article I, section 10, "is to protect
absolute common-law rights respecting person, property,
and reputation, as those rights existed when the Oregon
Constitution was drafted in 1857." And in *State v. Delgado*,
298 Or 395, 401, 692 P2d 610 (1984), to pick still another, the
court held that the question whether the state constitutional
right to bear arms applies to the possession of a switch-blade
knife depends on "whether the drafters would have intended
the word 'arms' to include the switch-blade knife[.]"

    In my view, the idea that the original state consti-
tution means no more than what it meant to its framers in
1857 is untenable. To begin with, all too often, the state of
the historical record is such that we simply cannot know
what the framers had in mind.[3] We do not even know with
any certainty that the framers intended that their intentions
or understandings should count in future constitutional
interpretation.[4] But even when the historical record does

---

[3] When faced with such circumstances, this court in some cases has attributed
to the framers of the Oregon Constitution knowledge of information that there
is no evidence they actually possessed. *See, e.g.*, *State v. Cookman*, 324 Or 19,
28-31, 920 P2d 1086 (1996) (attributing to the framers of the Oregon Constitution
an intention to follow an 1822 Indiana Supreme Court decision interpreting the
1816 version of the Indiana Constitution that was the predecessor to the 1851
Indiana Constitution that is presumed to be the basis for Oregon's *ex post facto*
clause, because the decision was, at least in a temporal sense, "available" to the
Oregon framers). The effect is to reconstruct a presumed intention that we have
no way of knowing accords with reality.

[4] That the delegates to the Oregon Constitutional Convention expressly
declined to create any official record of their debates would seem to suggest that
they did not care one way or the other. One of the arguments in favor of keeping
a record of the convention was precisely to preserve a record of the intentions of
the framers for future reference. Charles H. Carey ed., *The Oregon Constitution
and Proceedings and Debates of the Constitutional Convention of 1857* 140 (1926).
But the argument failed to carry the day. Moreover, any suggestion that the
prevailing interpretive conventions of the day presumed that the intentions or
understandings of the framers would control is at least debatable. *See, e.g.*, John
P. Figura, *Against the Creation Myth of Textualism: Theories of Constitutional
Interpretation in the Nineteenth Century*, 80 Miss LJ 587 (2010) (summarizing
various interpretive approaches reflected in nineteenth-century treatises).

permit some inferences and conclusions about the original intentions and understandings of the framers, the idea that those intentions and understandings are controlling makes the state's highest law little more than a historical artifact of an era that few in this century actually would choose as a determinant of individual rights and government authority—an era, it should be remembered, when women possessed few political and civil rights, when the common law recognized no protections for workers, and when the people decreed that a "negro" or "mulatto" who did not already reside in the state when the constitution was adopted was not permitted to reside in Oregon. Or Const, Art I, § 35, *repealed* 1926.

That is not to say that the historical context for the adoption of a constitutional provision is irrelevant. All provisions of a state constitution were adopted at a specific point in history. That history—including the intentions or understandings of the framers (or perhaps more precisely, the voters)[5]—is always relevant. State constitutions, after all, are commands designed to instruct citizens and government officials about the powers of government and the limitations on the exercise of those powers. As such, those commands invite consideration of their intended purposes.[6]

A number of constitutional provisions are of relatively recent vintage, adopted with comprehensive records as to the intentions or understandings of their makers, and prepared with the obvious expectation that those records be taken into account in determining the meaning of the provisions. In such cases, it makes much sense to heed carefully the available evidence of their intended purposes.[7]

[5] It is common to refer to the intentions of the "framers," but, given that the constitution derives its force from ratification by the people, it is actually the voters, not the framers in the constitutional convention, whose intentions or understandings count. *See Monaghan v. School District No. 1*, 211 Or 360, 367, 315 P2d 797 (1957) ("The constitution derives its force and effect from the people who ratified it and not from the proceedings of the convention where it was framed[.]").

[6] Thus, *Priest v. Pearce*, 314 Or 411, 415-16, 840 P2d 65 (1992), appropriately requires an examination of "the historical circumstances" that led to the adoption of a provision of the original constitution. *Priest*, however, does not require, as some of this court's later cases have suggested, that those historical circumstances determine the meaning of the provision at issue.

[7] Accordingly, the approach to constitutional interpretation of amendments adopted by initiative set out in *Ecumenical Ministries v. Oregon State Lottery Comm.*, 318 Or 551, 559-60, 871 P2d 106 (1994), with its focus on ascertaining the intentions of the people who adopted the amendments, seems correct to me.

But much of the original constitution consists of vaguely worded clauses adopted a century and a half in the past, with little or no record of their meanings or purposes. In such cases, it is difficult to speak with any precision about the intentions of the framers. Moreover, whatever we do know of the specific intentions of the framers of the Oregon Constitution is difficult to apply to modern circumstances that were hardly in the contemplation of persons who lived in the middle of the nineteenth century. At best, the historical record will offer, in very general terms, an idea of some underlying principles that may have animated the original provisions, which principles may be applied to modern circumstances.[8]

The search and seizure clause of Article I, section 9, that is at issue in this appeal is an excellent case in point. The clause requires that searches and seizures not be "unreasonable." Beyond the fact that the provision was obviously based on the Fourth Amendment, there is a complete absence of direct historical evidence of what the framers intended or what the voters understood about the provision. It was adopted without discussion in the constitutional convention, and there is no record of public debate about it during ratification. *See generally* Claudia Burton & Andrew Grade, *A Legislative History of the Oregon Constitution of 1857—Part I (Articles I & II)*, 37 Willamette L Rev 469, 515 (2001) (search and seizure provisions were passed with "no reported comment or debate"). Any attempt to reconstruct what the framers or voters might have intended in adopting Article I, section 9, will yield only speculation. There is no real consensus among historians about what people thought about search and seizure guarantees in the late-eighteenth century. There is an especially fierce debate among scholars about the original understanding of the Fourth Amendment.[9] There is perhaps slightly less

---

[8] Some of this court's more recent cases properly reflect that interpretive approach. *See, e.g.*, *State v. Davis*, 350 Or 440, 446, 256 P3d 1075 (2011) ("[The purpose of historical analysis] is not to freeze the meaning of the state constitution in the mid-nineteenth century. Rather it is to identify, in light of the meaning understood by the framers, relevant underlying principles that may inform our application of the constitutional text to modern circumstances.")

[9] The crux of the debate concerns whether the framers of the Fourth Amendment understood or intended that searches and seizures generally require warrants. Strictly speaking, the Fourth Amendment says only that searches and seizures be reasonable and that warrants should not issue except on probable cause. Some

controversy about the general understanding of state search and seizure clauses in the early- to mid-nineteenth century; it appears that most courts at that time interpreted them merely to require that searches and seizures be "reasonable" under the circumstances in which the actions occurred.[10]

A particularly significant problem with trying to apply Article I, section 9, as it would have been understood back in 1857 is the fact that its very wording invites analysis that is not historically bound. The requirement that searches and seizures be "reasonable" seems to me to necessitate constant reassessment in light of changing circumstances. Trying to determine what is reasonable today by looking solely to nineteenth-century history seems to me akin to trying to drive a vehicle on an interstate highway by looking only in the rearview mirror.

In short, the majority is correct in rejecting the state's contention that we should interpret the search and seizure clause of Article I, section 9, to reflect only the intentions or understandings of its framers in 1857. My point in writing separately is to explain my view that there are important underlying reasons why we should not interpret the search and seizure clause that way—reasons that

scholars, however, argue that the framers understood the amendment implicitly to require warrants. *See, e.g.*, William J. Cuddihy, *The Fourth Amendment: Origins and Original Meaning 1602-1791* (2009). Others argue that the Fourth Amendment merely requires that searches and seizures not be unreasonable. *See, e.g.*, Akhil Reed Amar, *Fourth Amendment First Principles*, 107 Harv L Rev 757 (1994). Still others contend that the "reasonableness clause" of the amendment was intended only as a preamble and that the sole purpose of operative provision was to limit the issuance of warrants. *See, e.g.*, Thomas Y. Davies, *Recovering the Original Fourth Amendment*, 98 Mich L Rev 547 (1999). And yet others argue that the Fourth Amendment was originally intended only to regulate the issuance of warrants to search houses. *See, e.g.*, David E. Steinberg, *The Uses and Misuses of Fourth Amendment History*, 10 U Pa J Const L 581 (2008).

[10] *See, e.g.*, *Rohan v. Sawin*, 59 Mass 281, 284-85 (1850) (purpose of state and federal search and seizure guarantee was solely to require that warrants issue on sworn complaint establishing probable cause); *Wakely v. Hart*, 6 Binn 315, 318 (Pa 1814) (state constitution does not prohibit warrantless searches and requires only that warrants issue on probable cause); *Mayo v. Wilson*, 1 NH 53, 60 (1817) (state constitution "does not seem intended to restrain the legislature from authorizing arrests without warrant, but to guard against the abuse of warrants issued by magistrates"). In fact, as late as 1927, this court held that "the possession of [a] warrant is not the controlling consideration of whether a search is reasonable or unreasonable. An officer armed with a warrant may make an unreasonable search. An officer without a warrant may make a reasonable search." *State v. De Ford*, 120 Or 444, 452, 250 P 220 (1927).

counsel the exercise of caution and skepticism in assessing the significance of such nineteenth-century intentions and understandings as we interpret other provisions of the original constitution, as well.

**WALTERS, J.,** dissenting.

The majority is bold, and it is deft. The majority begins by affirming the rule of *stare decisis,* declaring that "the party seeking to change a precedent must assume responsibility for affirmatively persuading us that we should abandon that precedent" and deciding that the state did not meet its burden of persuasion in this case. 353 Or at 137. Then, by sleight of hand, the majority reverses its holdings in *State v. Hall*, 339 Or 7, 115 P3d 908 (2005), and *State v. Rodgers/Kirkeby*, 347 Or 610, 227 P3d 695 (2010), a case that this court decided just three years ago.

In *Hall,* police officers unlawfully and unconstitutionally stopped the defendant without reasonable suspicion of criminal activity. During the illegal stop, the officers asked for and the defendant gave his consent to search. The officers were polite and did not threaten or cajole the defendant. There was no evidence that the officers had acted egregiously. The court nevertheless held that the evidence that the officers obtained as a result of the consent search *was not admissible* because the state had not proved "that defendant's decision to consent, even if voluntary, *was not the product* of the preceding violation of defendant's rights under Article I, section 9." 339 Or at 29 (emphasis added).

In this case, the police also unlawfully and unconstitutionally stopped defendant without reasonable suspicion of criminal activity and asked him for his consent to search. The majority holds that the evidence that the police obtained when defendant first consented to the search *was admissible* because it was *not the product of* the preceding violation. 353 Or at 154. Yet the majority does not overrule its holding in *Hall*, nor does it distinguish it.

In 2010, this court reaffirmed its holding in *Hall* in *State v. Rodgers/Kirkeby*, 347 Or 610. In *Rodgers/Kirkeby*, the court held that the defendants' consents to search were

the products of unlawful detention and must be suppressed. The court explained:

> "It was during the period of unlawful detention that the officers requested that each defendant consent to a search. Here, as in *Hall,* neither defendant spontaneously granted the officers consent to search; instead, each defendant gave his consent in response to the officers' requests. The state does not advance any argument to this court to satisfy its burden under *Hall* that intervening circumstances or factors severed the connection between the unlawful seizures and defendants' consent. Thus, as in *Hall,* given the temporal proximity between the illegal detention and each defendant's consent, and in the absence of any other intervening circumstances, or other circumstances mitigating the effect of the unlawful seizures of each defendant, we conclude that each defendant's consent, even if voluntary, was the product of police conduct that violated Article I, section 9. Because the consent to search in each case was a product of the unlawful seizure, the evidence obtained during the search, in both cases, must be suppressed."

*Id.* at 630. The officers in *Rodgers/Kirkeby* did not threaten or cajole the defendants. There was no evidence that the officers acted in an egregious manner. If the holding in *Rodgers/Kirkeby* is no longer good law, why does the majority not overrule it? If *Rodgers/Kirkeby* is still good law, why does the majority not distinguish it?

The majority also fails to contend with other cases that should carry precedential weight. In *Hall,* the court carefully considered those cases and said:

> "In our view, the circumstances at issue here more closely resemble the circumstances at issue in *Dominguez-Martinez* and *Toevs,* rather than the circumstances at issue in *Kennedy* and *Rodriguez.* Similarly to the defendants in *Dominguez-Martinez* and *Toevs,* defendant here consented to the search during an unlawful stop. Unlike the defendants in *Rodriguez* and *Kennedy,* defendant's grant of consent was not spontaneous but, instead, was made only in response to [the officer's] request that defendant allow a search. [The officer] made that request immediately after he had questioned defendant about whether defendant was carrying any weapons or illegal drugs and while he was waiting for the results of defendant's warrant check. Given

> the close temporal proximity between the illegal detention and defendant's consent, and the absence of any intervening circumstances or other circumstances mitigating the effect of that unlawful police conduct, we cannot say that the state has proved that defendant's decision to consent, even if voluntary, was not the product of the preceding violation of defendant's rights under Article I, section 9. We therefore conclude that the unlawful seizure of defendant vitiated his consent to the search and, for that reason, the evidence from that search is inadmissible under Article I, section 9."

339 Or at 36. In this case, the majority relies heavily on *Rodriguez,* a case that the court considered and distinguished in *Hall,* but says nothing about *Dominguez-Martinez* and *Toevs,* the cases that the court cited in support of its decision in *Hall*. Are those cases no longer good law, or are they distinguishable? The majority does not say.

The majority justifies its failure to grapple with the need for stability and predictability that the rule of *stare decisis* fosters by claiming that it has merely "clarified" *Hall* while continuing to adhere to the precept that a court must suppress evidence obtained from a consent search if the consent was obtained "through exploitation of the unlawful police conduct." 353 Or at 137.[1] *Hall* and *Rodgers/Kirkeby* undoubtedly stand for that precept, but they do not stand for that precept alone. They also stand for the rule that evidence is obtained through exploitation when the police unlawfully stop citizens and, while continuing to detain them without legal authority to do so, request that they submit to search. Under *Hall* and *Rodgers/Kirkeby*, the law has been that, in the absence of intervening or mitigating circumstances, the evidence that the police obtain must be suppressed *even when the citizens' consents to search are voluntary*. This court may distinguish or even reverse those holdings, but it should do so openly and in accordance with the rule of *stare decisis.* Because the majority does otherwise, I ask the question that all citizens have the right to ask: What force

---

[1] In 2011, this court reiterated that "[f]ew legal principles are so central to our tradition as the concept that courts should '[t]reat like cases alike,' * * * and *stare decisis* is one means of advancing that goal." *Farmers Ins. Co. v. Mowry*, 350 Or 686, 698, 261 P3d 1 (2011) (second alteration in original; citation omitted).

does the rule of law have if a court can avoid it by refusing to call it by its right name?

I press my point because, in effectively overruling *Hall* and *Rodgers/Kirkeby*, the majority changes the exclusionary rule as Oregon has known it and, in my view, does so to the detriment of Oregonians. The majority defends its decision by saying that *Hall*'s exploitation test "failed to give sufficient weight to a defendant's voluntary consent to a search * * *." 353 Or at 149. But as the majority so aptly explains, whether a defendant's consent was voluntary is a question that is distinct from the question of whether the evidence that the police obtained was a product of their illegal conduct. *Id.* at 12.

The aim of the Oregon exclusionary rule is to restore a defendant to the same position as if "the government's officers had stayed within the law." *State v. Davis,* 295 Or 227, 234, 666 P2d 802 (1983). Before today, this court had "rejected the view that the Oregon exclusionary rule is predicated upon a deterrence rationale" and instead had adopted a rule "that serves to vindicate a defendant's personal rights. In other words, the right to be free from unreasonable searches and seizures under Article I, section 9, also encompasses the right to be free from the use of evidence obtained in violation of that state constitutional provision." *Hall*, 339 Or at 24 (citing *State v. Davis*, 313 Or 246, 249, 834 P2d 1008 (1992)).

The majority's new test focuses not on whether the police violated a defendant's constitutional right against unreasonable seizure and obtained evidence as a result, but on whether the police also engaged in purposeful or additional misconduct that may have affected the defendant's decision to consent. The majority justifies consideration of those factors by explaining that

> "police misconduct that is intended to gain a defendant's consent may well be more likely to substantially affect that defendant's decision to consent. Likewise, particularly egregious police misconduct—such as excessive use of force in unlawfully seizing a defendant—is more likely to affect the defendant's decision to consent than more restrained police behavior."

353 Or at 147. I do not quarrel with that reasoning; I question its role in the exploitation analysis.

When the police unconstitutionally stop or detain a defendant and act with an illegal purpose or engage in egregious misconduct, a court must consider whether the defendant's subsequent consent to search is voluntary. Police actions that deprive a defendant of constitutional rights or exert unconstitutional coercion may render a defendant's consent involuntary. *See State v. Kennedy*, 290 Or 493, 624 P2d 99 (1981). But, as the majority acknowledges, *even when a defendant's consent is voluntary*, evidence that is the product of illegal police misconduct is subject to suppression. 353 Or at 140. In this case, the majority's decision that the evidence that the police obtained was admissible because the police actions, although illegal, were not egregious and may not have affected defendant's decision to consent may reflect an accurate assessment that defendant's consent was voluntary in the sense that it was an act of free will. However, the majority fails to grapple sufficiently with whether defendant's consent was, nevertheless, a product of the officer's unlawful stop and detention. *Hall* and *Rodgers/Kirkeby* recognize the reality of the power imbalance that exists when the police use their authority to unlawfully stop and detain a person and then, while continuing to exert that authority, seek consent to search. The majority conflates the voluntariness and exploitation prongs of the analysis and wrongly fails to give sufficient effect to the constitutional mandate of the exclusionary rule in Oregon—that courts apply it to vindicate a defendant's personal right against unconstitutional seizure. *Hall*, 339 Or at 24; *Davis*, 313 Or at 249.

The majority's new test also upends the Oregon exclusionary rule in other ways. Before today, the inquiry that the court used to decide whether police had exploited an illegality and obtained evidence that must be suppressed was an objective, logical one that did not require analysis of the subjective motivation of the police in seeking a defendant's consent to search or of the subjective effect that the police misconduct had on a defendant's decision to give consent. By adopting an exploitation test that now permits or even requires both, the majority shifts away from the

objectivity and logic of the exploitation prong of the analysis and imposes a test that is both more intrusive and less clear. It may seem right to instruct courts and officers to consider "the totality of the circumstances," but police officers and trial courts endeavor to make decisions that this court will uphold and are entitled to more guidance than the majority gives. If the facts unfold as they did in *Hall* and *Rodgers/Kirkeby,* must the trial court suppress the evidence as this court required in those cases, or, considering the fact that the police were polite, must the trial court now admit the evidence?

Until today, certain consequences followed when the police illegally and unconstitutionally stopped citizens without probable cause or reasonable suspicion and, while continuing to unlawfully detain them, asked for and obtained their consent to search. Today, the majority has eliminated, or at least substantially altered, the certainty that the violation of a defendant's constitutional rights will be vindicated. If the majority had acknowledged and attempted to justify its abandonment of precedent, I might be more satisfied as a judge, but I do not know that I would be more comfortable as a citizen.

The majority is bold, and it is deft. In my view, the majority is also wrong. I respectfully dissent.

De Muniz, Senior Judge, Justice pro tempore, joins in this dissent.